**In re COMPAQ SECURITIES
LITIGATION.**

Civ. A. No. H–91–9191.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 28, 1993.

Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach, New York City, Sherrie R. Savett, Berger & Montague, Eugene A. Spector, Spector & Roseman, Roberta Liebenberg, Mager, Liebenberg & White, Philadelphia, PA, William B. Emmons, Emmons & Vincent, Houston, TX, for plaintiffs.

Charles B. Schwartz Vinson & Elkins, Houston, TX, for defendants.

### MEMORANDUM AND ORDER

LAKE, District Judge.

### I. *Introduction*

This action is a consolidation of several individually filed suits. (Agreed Pretrial Order Number One, Docket Entry No. 1 (consolidating and redesignating the case as H–91–9191, assigned to Judge Lynn N. Hughes)) The plaintiffs are a large group of investors who either purchased shares of defendant, Compaq Computer Corporation's, publicly-traded common stock or call options or sold Compaq put options in trades transacted on one of several public exchanges from December 4, 1990, to May 14, 1991. Judge Hughes conditionally certified a subset of plaintiffs to proceed as a class with respect to claims alleging primary violations of the federal securities laws on December 13, 1991.[1] (Agreed Pretrial Order Number Two, Docket Entry No. 11) Judge Hughes recused on January 6, 1992, and the action was reassigned to the undersigned judge on January 8. (Docket Entry No. 12)

On August 28, 1992, plaintiffs filed a Second Amended Consolidated Complaint ("Complaint"; Docket Entry No. 22). The Complaint alleges that plaintiffs suffered damages by trading Compaq securities at a price artificially inflated[2] by defendants' false and misleading statements, failure to disclose material adverse information, and failure to correct the false and misleadingly positive nature of prior statements. Plaintiffs claim that defendants violated (1) the Securities and Exchange Act of 1934 ('34 Act);[3] (2) Rule 10b–5;[4] (3) the Texas common law of negligent misrepresentation; (4) § 27.01 of the Texas Business and Commerce Code;[5] and (5) the Texas Securities Act.[6]

Pending before the court is the Motion to Dismiss (Docket Entry No. 23) of defendants, Compaq and a number of its present and former officers and directors (collectively, Control Person Defendants). Because that motion relies on materials outside the Complaint the court converted it into a motion for summary judgment pursuant to Fed. R.Civ.P. 56 on October 28, 1992 (Docket Entry No. 29).

### II. *Background*

Compaq is a Houston, Texas, based manufacturer of computer systems and related products. The company was founded in 1982 and gained immediate popularity for marketing a competitively priced clone of the industry standard personal and portable computers pioneered by International Business Machines, Inc. (IBM). By early 1990 Compaq had evolved into a rival of IBM; Compaq

---

1. Class members were limited to common stock purchasers.

2. The price paid by the named plaintiffs for these shares of common stock ranged from 49¼ to 73⅞ per share. The Complaint alleges that after disclosure of the first quarter of fiscal year 1991 financial statements, the price dropped 9⅜ in one day, from 61⅞ to 52½. The Complaint further alleges that when management made public its negative projections of earnings and revenue for the second quarter on May 14, 1991, the price dropped an additional 13 points in one trading day.

3. Plaintiffs allege that defendants violated §§ 10(b) and 20(a) of the '34 Act. 15 U.S.C. §§ 78j(b) and 78t(a), respectively. Section 10(b) imposes liability upon persons who make misrep-

resentations or omissions or utilize other fraudulent devices in connection with the purchase or sale of securities. Section 20(a) imposes joint and several liability on persons who are in "control" of those who violate federal securities laws, including § 10(b) in most instances.

4. 17 C.F.R. § 240.10b–5 (1993), promulgated by the Securities and Exchange Commission (SEC) pursuant to the '34 Act, is commonly known simply as Rule 10b–5.

5. Tex.Bus. & Com.Code Ann. § 27.01 (Vernon 1987) provides a statutory remedy for fraud in connection with the sale of real estate and stock transactions.

6. Tex.Civ.Stat.Ann. art. 581–33 (Vernon Supp. 1993).

researched, designed, manufactured, and marketed technologically advanced computer products at a premium price.

Plaintiffs allege that in the latter part of 1990 Compaq's management became aware that the company would have to dramatically change its marketing strategy to maintain acceptable levels of market share, unit sales, and gross revenue. Plaintiffs allege that management concealed their awareness of a variety of domestic and international markets and economic forces that were then combining to cause severe pressure on the company's ability to issue positive financial reports. Plaintiffs allege that management concealed from both the public and the company's board of directors the truth about its future financial situation and withheld from the public information about several extraordinary marketing programs that management intended to implement to forestall public disclosure of its true future financial situation.

■ Plaintiffs allege that management's efforts to conceal this negative information were generally successful through the end of the first quarter of 1991. They contend that management was able to forestall full disclosure until May 15, 1991, in the middle of the second quarter, as a result of a campaign to issue vigorous denials that the company was about to suffer an inevitable reversal of fortunes. Plaintiffs allege that when management's positive and upbeat statements about the company's current and future performance were issued management was aware of information that contradicted both their tone and content. Plaintiffs point to sales by many Control Person Defendants of significant quantities of company stock at high prices during February of 1991 as proof of a motive for concealment, the origin of an addi-

tional duty to disclose,[7] and the success of management's conspiracy to conceal information.

Defendants argue that dismissal or summary judgment of all of plaintiffs' claims is appropriate. They urge dismissal with respect to all claims based on fraud because the plaintiffs have failed to plead with sufficient particularity to satisfy Fed.R.Civ.P. 9(b). They seek summary judgment on those claims based on violations of the federal securities laws because plaintiffs have failed to bring sufficient evidence to satisfy their burden to prove all of the elements of a *prima facie* case.

### III. *Dismissal Under Rule 9(b)*

■ Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Since Rule 9(b) is to be read in conjunction with Rule 8's general notice pleading requirement that pleadings contain a "short and plain statement of the claim," it can be satisfied as long as the complaint contains information concerning the "time, place, and nature of fraudulent behavior and defendant's relationship thereto." *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 273 (N.D.Tex.), *clarified on unrelated issue*, 739 F.Supp. 1087 (1990). In a similar vein Judge Posner recently explained that "[r]ule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that plaintiff claims was fraudulent." *Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir.1993).

---

**7.** The so called "disclose or abstain" rule can give rise to liability under § 10(b) and Rule 10b–5 whenever corporate insiders trade on the basis of material non-public information. Corporate insiders wishing to trade must either disclose the information or wait until it has been disclosed in the natural course of events before trading. *See, e.g., In re Zenith Laboratories Sec. Litig.*, No. 86–3241A, 1993 WL 260683 at *7 (D.N.J. Feb. 11, 1993) ("A duty to disclose exists only under certain limited circumstances. One such circumstance is when a corporate insider has used material nonpublic information to profit in the securities markets. Directors, officers, and prin-

cipal shareholders all qualify as corporate insiders under section 10(b), as long as they 'have obtained confidential information by reason of their position with that corporation.'" (citations omitted)); *In re Cady Roberts & Co.*, 40 S.E.C. 907 (1961). Plaintiffs apparently included this allegation in an attempt to avoid the possibility that the trading Control Person Defendants could escape liability as "controlling persons" under § 20(a) because they had no independent duty to disclose. *See Southwest Realty, Ltd. v. Daseke*, No. CA3–89–3055–D, 1992 WL 373166 at *10–11 1992 U.S.Dist. LEXIS 18855 at *35–37 (N.D.Tex. May 21, 1992).

Citing *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990), defendants argue that the Complaint is deficient because it only alleges from the vantage of hindsight that defendants must be guilty of fraud. In *DiLeo* the court upheld dismissal of a complaint that alleged fraud based on an accounting firm's failure to indicate potential loan defaults in financial statements. The court held dismissal was proper where the complaint failed to specify particular loans that the accountants knew would ultimately go into default.

*DiLeo* must be read in conjunction with cases similar to the present action in which the defendants had an alleged motive to withhold information. For example, in *Morse v. Abbott Laboratories*, 756 F.Supp. 1108 (N.D.Ill.1991), the court distinguished *DiLeo* because the complaint in *Morse* contained more than mere allegations based upon hindsight that financial reports should have contained certain information, and because the director and officer defendants in *Morse*, unlike the accounting firm in *DiLeo*, had significant motives [8] and substantial opportunities to withhold disclosure adversely affecting the company. The *Morse* complaint survived the need to specify conduct on the part of the individually named defendants because "where the false or misleading information is conveyed in ... registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Morse*, 756 F.Supp. at 1111. *See also In re Taxable Municipal Bond Sec. Litig.*, 1992 WL 161043 at *1–2 (E.D.La. June 19, 1992) (utilizing the "group-published information" presumption); *In re Merrell Dow Inc., Sec. Litig.*, 1993 WL 393810 at *5–6 (W.D.Mo. Oct. 19, 1993) (reviewing current trend toward adopting that presumption in various circuits but noting that it should be limited to "insider directors").

■ The Complaint contains numerous specific references to allegedly intentional acts and omissions in furtherance of a large-scale fraud on the part of the Control Person Defendants. The Complaint lists names, dates, specific events, and objective references to evidence that could support a conclusion that defendants' public statements were made with knowledge of their alleged falsity. *See, e.g.*, Complaint ¶¶ 40–49 (identifying numerous specific occasions of alleged misrepresentations by named Control Person Defendants that, if proven, could support violations of Rule 10b–5). The court concludes that the Complaint is more than minimally adequate to allege violations of the federal securities laws under Rule 9(b).

■ In addition to attacking the factual sufficiency of the Complaint defendants argue that plaintiffs have failed to allege a sufficient showing of scienter. This argument fails for several reasons. First, the Complaint alleges that scienter on the part of both the company and the Control Person Defendants can be inferred from their combined interest in continuing to present positive financial reports. The company's motive was to continue to attract investors' capital, while the individual defendants were allegedly motivated by their interest in preserving themselves in comfortable managerial positions with the company as long as possible. Second, although the Control Person Defendants that traded have produced affidavits asserting sundry benign reasons for engaging in large stock transactions during the time designated as the "class period," the affidavits do not establish that plaintiffs failed to *plead* an inference of scienter by describing these trades and linking their timing to allegations that the Control Person Defendants then knew of material, non-public, adverse information. Third, the Complaint passes muster under Rule 9(b) because it includes specific allegations that the speak-

---

8. *See* Roger J. Dennis, *Mandatory Disclosure Theory and Management Projections: A Law and Economics Perspective*, 46 Md.L.Rev. 1197, 1208 n. 64 (1987) (noting that incentives for disclosure exist only for positive information because "[p]ublicly traded corporations routinely compensate executives based on firm performance as reflected in stock prices."). In contrast, "[g]iven the facts of [the *DiLeo* ] case, the court found that defendants had nothing to gain from the deceit and therefore no credible motive." *Kas v. Caterpillar, Inc.*, 815 F.Supp. 1158, 1163 (C.D.Ill. 1992) (denying Rule 9(b) dismissal for claims similar to those in the present action).

ers were aware of significant adverse information when they made upbeat statements.

■ Plaintiffs also allege causes of action under § 27.01 of the Texas Business & Commerce Code and the Texas Securities Act that sound in fraud.[9] Plaintiffs' Complaint, just as the complaint in *Morse*, "only states a conclusion that actual reliance existed."[10] Nonetheless, "[w]hile ... plaintiff's allegations of reliance are conclusory, this is inherently true of reliance allegations. One either relies on a particular statement or one does not, there is no middle ground." *Steiner v. Southmark*, 734 F.Supp. at 275. The court concludes that plaintiffs' state law fraud[11] claims contain sufficient specific allegations to pass review under Rule 9(b).

## IV. *Summary Judgment*

### A. *Legal Standard*

Summary judgment is warranted if defendants establish that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed.R.Civ.P. 56(c). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Fifth Circuit has recently noted that

[t]he party that moves for summary judgment bears the burden to establish that its opponent has failed to raise a genuine issue of material fact. To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense. If the movant satisfies this burden, the burden shifts to the non-movant to demonstrate that summary judgment is inappropriate.

*Haralson*, 919 F.2d at 1025 ("To succeed in a common law fraud action, a plaintiff's reliance ... must be justifiable as well as actual"). *See also Steiner v. Southmark*, 734 F.Supp. at 279 (declining to "incorporate the fraud-on-the-market presumption of reliance into Texas state law" in context of common law fraud action). Plaintiffs' claim under § 33 of the Texas Securities Act, Tex.Civ.Stat.Ann. art. 581–33 (Vernon Supp. 1993), is not similarly restricted to persons who relied on alleged misrepresentations. Claude P. Bordwine, Jr., *Civil Remedies Under the Texas Securities Laws*, 8 Hous.L.Rev. 657, 671 (1971).

**9.** The Fifth Circuit has stated that because § 27.01 "is derived from Texas common law fraud, the reliance and materiality elements ... do not differ from those of Texas common law fraud." *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 n. 4 (5th Cir.1990), *modified in unrelated way*, (Jan. 25, 1991). *See also* J. Warren Huff, *Texas Business & Commercial Code Section 27.01: An Alternative to Federal Securities Fraud Remedies*, 33 Sw.L.J. 703, 719 (1979) ("In order to recover under section 27.01, the defrauded party must demonstrate that he relied on the false representation.... Thus, section 27.01 merely adopted the common law rule....").

Under Texas law, a plaintiff may recover for fraud upon establishing that (1) the defendant made a false material representation consisting of either a positive untrue statement of material fact, the concealment of a material fact, or nondisclosure of a material fact which he had a duty to disclose; (2) the defendant knew the material representation was false or make it recklessly without any knowledge of its truth; (3) he made the representation with the intent that it should be acted upon by the plaintiff; (4) the plaintiff acted in reliance upon the representation; and (5) the plaintiff suffered injury.

*Gibraltar Savings v. LD Brinkman Corp.*, 860 F.2d 1275, 1298 (5th Cir.1988), *cert. denied sub nom.*, *LDB Corp. v. Gibraltar Savings*, 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989); *accord*

**10.** Although the Complaint is lengthy its allegation of actual reliance is brief: "Plaintiffs and the other members of the Class relied to their detriment on those false representations in entering into those contracts." (Complaint ¶ 96)

**11.** Although *Morse* utilized Rule 9(b) to dismiss the plaintiff's claim for negligent misrepresentation, the rule's particularity requirement is only activated when a claim alleges fraud. *See In re Haas*, 36 B.R. 683, 688 (Bankr.N.D.Ill.1984) (Rule 9(b) "is applicable to an action ... where ... the allegations of the complaint sound in fraud rather than in negligence."). The court therefore declines to extend Rule 9(b)'s requirements to the negligent misrepresentation claims in Count II of the Complaint.

*Little v. Liquid Air Corp.,* 952 F.2d 841, 847 (5th Cir.1992), *reh'g en banc* ordered Jan. 28, 1992 (citations omitted). The non-moving party must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, or admissions on file that specific facts exist over which there is a genuine issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-movant's evidence is believed and all justifiable inferences will be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

**B. *Claims under § 10(b) and Rule 10b–5***

■ "Section 10(b) prohibits any person from using or employing any 'manipulative or deceptive device' in connection with the sale of a security. Rule 10b–5 ... forbids the making of 'any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....'" *In re Verifone Sec. Litig.,* 11 F.3d 865, 868 (9th Cir.1993). In order to prove that defendants violated § 10(b) or Rule 10b–5, plaintiffs must show:

(1) a material misrepresentation in connection with the purchase or sale of a security (2) committed with scienter by the defendants and (3) relied upon by the plaintiff, (4) who has exercised due diligence to pursue his own interest so that his reliance is justifiable.

*Schlesinger v. Herzog,* 2 F.3d 135, 139 (5th Cir.1993). The court may grant summary judgment in favor of defendants if the plaintiffs' summary judgment evidence fails to raise a genuine issue of material fact as to any one of these elements. *Fine v. American Solar King Corp.,* 919 F.2d 290, 294 (5th Cir.1990), *cert. dismissed sub nom., Hurdman v. Fine,* —— U.S. ——, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

■ Defendants argue that the summary judgment evidence negates the essential elements of plaintiffs' justifiable reliance.[12] Defendants proceed from the premise that plaintiffs seek to invoke the burden-shifting presumption of reliance provided by the "fraud-on-the-market" theory. In *Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988), the Supreme Court explained that

[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

The effect of this presumption is to shift to defendants the burden of persuasion to rebut plaintiffs' reliance. *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1120 (5th Cir.1988), *vacated in part on other grounds sub nom., Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 *and cert. denied, Abell v. Wright, Lindsey & Jennings,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989).[13]

In *Basic* the Court recognized that the presumption is rebuttable: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic,* 485 U.S. at 247, 108 S.Ct. at 992. The Fifth Circuit applies the same rule. *See Fine,* 919 F.2d at 299 (fraud-on-the-market presumption is rebuttable by showing that "nondisclosures did not affect the market price."). For example, a defendant could rebut the presumption by showing that the "market makers" knew of the nondisclosed information even though the general public did not—thus negating the effect nondisclo-

---

**12.** As discussed in Part IV B.2, *infra,* defendants also argue that they are entitled to summary judgment because the element of a material misrepresentation is lacking as to certain company-specific information that defendants allegedly failed to disclose.

**13.** The unusual disposition of this case required the Fifth Circuit to clarify that its decision was still authoritative as it pertained to federal securities law since the Supreme Court only vacated the Racketeer Influenced and Corrupt Organizations Act (RICO) aspects of the case. *First Nat'l Bank of Commerce v. Monco Agency, Inc.,* 911 F.2d 1053, 1061 n. 15 (5th Cir.1990).

sure would have on the market price; that the general public constructively knew the information because the news had credibly entered the market—thus eliminating the justifiability of any reliance; and that the particular plaintiffs would have traded at the same price regardless of actual knowledge due to reasons unrelated to the information. *Basic*, 485 U.S. at 247–49, 108 S.Ct. at 992–93.[14]

Plaintiffs have identified a number of defendants' statements that allegedly contain misrepresentations due both to omissions and to affirmative misstatements. For the sake of convenience the court has organized these claims into four categories: (1) "global information," *i.e.*, industry-wide, nationwide, or international conditions relevant to future financial performance; (2) company-specific general information relevant to future financial performance; (3) projections and optimism, *i.e.*, management-generated, forward-looking statements and plans designed to affect future financial performance; and (4) historical facts. Defendants argue that some or all of the misrepresentations plaintiffs complain of were either not material at all, were known to the market makers, or were corrected through widespread dissemination of counter-information in the relevant market.[15]

### 1. Global information

■ Defendants argue that any failure to disclose information concerning management's internal consideration of the effects of competition from other computer manufacturers, the domestic economic recession, and domestic and foreign monetary policies on financial performance cannot form the basis of a § 10(b) or Rule 10b–5 violation because management's opinions on these matters are immaterial as a matter of law since they are not ordinarily relied upon by analysts and other market makers. One of the most persuasive documents produced by either party on the effect that management's failure to openly discuss information in this category may have on a company's market price is provided by plaintiffs' financial analyst expert, Candace L. Preston. In her affidavit Ms. Preston states:

> [A]n analyst must be thorough and diligent in doing the necessary work in preparing a research report. Included among the basic investigative steps appropriate for a fundamental company analysis is an investigation in [sic] a company's future outlook:
>
> > [An analyst should e]xamine principal determinants of operating and financial performance, ... competitive outlook, major risks (*e.g.*, competition, erosion of customer base, ... technological obsolescence. ... [16]

14. Due to the procedural posture of *Basic* the Court merely ruled that a lower federal court could adopt the fraud-on-the-market theory it described.

15. Although the Fifth Circuit has not explicitly held that dissemination of counter-information will rebut the presumption of fraud-on-the-market reliance, it has recognized that one factor a court must consider in determining whether a defendant had the duty to speak is "the parties' relative access to the information to be disclosed." *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1979). The Second, Fourth, Seventh, and Ninth Circuits have expressly acknowledged that defendants can escape liability by showing that the allegedly undisclosed information had been widely disseminated in the relevant market. *See, e.g., Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) (affirming summary judgment where material information omitted from proxy statement was widely disseminated); *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262–63 (4th Cir.1993) ("[although] genuine issues of

material fact exist with respect to the mix of information prior to December 17, 1988, we agree ... that ... on or after this date ... the market was fully apprised of the failing financial condition [previously undisclosed in misleading statements]."); *Associated Randall Bank v. Griffin, Kubik*, 3 F.3d 208, 214 (7th Cir.1993) (utilizing the recently coined term "truth-on-the-market" for this type of rebuttal argument); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied sub nom., Schneider v. Apple Computer, Inc.*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("We conclude that in a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources.").

16. Affidavit of Candace L. Preston, ¶ 5 (citation and footnote omitted), Exhibit 71 (Plaintiffs' Exhibit 71) to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment. (Plaintiffs' Opposition, Docket Entry No. 55)

Ms. Preston also states that an analyst should "[d]evelop what impact fiscal and/or monetary policies in force domestically as well as overseas, currency exchange rates, and business cycle conditions will have on a company or its industry."[17]  Plaintiffs' own evidence thus acknowledges that the allegedly omitted information on industry-wide conditions—*e.g.,* those alleged in ¶¶ 44(a) (increased competitive pressure) and 51(2) (overall market shrinkage)—are matters that analysts are under a duty to independently investigate.

■ Although market makers often use analysts' opinions rather than management's to form the basis for their decisions about the appropriate market price for a company's stock,[18] the court is not persuaded that management's statements about general economic matters could never be material.  Even though market makers are independently able to investigate these widely known conditions, management's failure to discuss their effects can still form the basis for liability under § 10(b) or Rule 10b–5 if management dishonestly or recklessly formulates publicly disclosed projections, estimates, or other statements based on its interpretation of obviously unreliable information.[19]

Plaintiffs have argued, but presented no evidence, that management's publicly disclosed estimates and projections, which are overly optimistic in hindsight, were arrived at through dishonest or reckless consideration of unreliable information about the effects of competition from other computer manufacturers or the domestic economic recession.  Since, as plaintiffs' own expert recognizes, the market does not ordinarily rely on management's disclosure of such information, and plaintiffs have presented no evidence to show that· this is the unusual case where the market actually relied on management's opinions, the reliance element of a claim under § 10(b) and Rule 10b–5 is lacking and summary judgment on these alleged omissions is appropriate.

■ Plaintiffs' claims concerning the effect of international currency exchange rate fluctuations on Compaq's financial performance are stronger because they are based primarily on defendants' alleged affirmative misstatements.  Liability under § 10(b) and Rule 10b–5 is appropriate when a speaker fails to speak the whole truth.  *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314, 1317 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1979) ("where the defendant has revealed some relevant, material information even though he had no duty ... a duty to speak the full truth arises...."); *accord, Sailors v. Northern States Power Co.,* No. 4–92–253, 1992 WL 532172 at *5 (D.Minn. July 13, 1992), *aff'd,* 4 F.3d 610 (8th Cir.1993).

■ Defendants argue that even if they intentionally misstated the effect of foreign currency exchange rates, they cannot be held liable for such misstatements because contrary information was widely disseminated to the market by a large number of credible sources.  The summary judgment evidence conclusively shows that despite defendants' efforts to downplay the significance of cur-

---

**17.** Preston Affidavit, Plaintiffs' Exhibit 71, ¶ 9 (citation and footnote omitted).

**18.** As Judge Easterbrook observed in *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 514–15 (7th Cir.1989), analysts are expected to recalculate management's projections of future financial performance by determining how management's disclosure of company-specific information will be affected by the effects of industry-wide and global conditions.  *See also Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993) (approvingly quoting Judge Easterbrook's language).  According to some commentators analysts are in "at least as good and probably a better position to make the predictions about a corporation's future which are relevant to the valuation of corporate securities."  *In re*

*Verifone Sec. Litig.,* 784 F.Supp. 1471, 1481 (N.D.Cal.1992), *aff'd,* 11 F.3d 865, 868 (9th Cir. 1993) (citing Dennis, *supra* note 8, at 1209–15).

**19.** *See Furman v. Sherwood,* 833 F.Supp. 408, 412 (S.D.N.Y.1993) ("Statements which predict the Company's future performance may be the basis of a securities claim ... if ... their preparation was so egregious as to render their dissemination reckless."); *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied sub nom., Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (opinions or forecasts based on unreliable information may give rise to an inference of scienter and, in some circumstances, a duty to disclose "data indicating that the opinion or forecast may be doubtful.").

rency exchange rates on Compaq's earnings, the market demonstrated its capacity for attaining and analyzing data available from other sources and comparing that analysis to the company's projections to arrive at a fully informed market price.[20] Therefore, even if defendants did materially misrepresent the effect of currency exchange fluctuations, the court concludes that the market did not rely on defendants' statements to establish the market price of the company's securities. Since the reliance element of a claim based upon these statements is missing, summary judgment is appropriate.

### 2. Company-specific information

Defendants acknowledge that § 10(b) and Rule 10b–5 obligate management to reveal company-specific information when that information is material or necessary to make previous statements not misleading. Plaintiffs allege that defendants breached this duty by failing to disclose material information concerning the effects that dealer consolidations (Complaint ¶¶ 44(d), 49(a) & (b), 65(b)(d) & (e)) and Compaq's competitive disadvantage due to inferior customer service (Complaint ¶¶ 44(e), (i) and 74(a)) and other similar company-specific issues would have on the company's financial performance. Defendants argue that they have no duty to disclose information that was already known to the market makers, if not to the general public. The Ninth Circuit, when reviewing allegedly overly optimistic, product-specific statements has observed that

[e]ven in a fraud on the market case, corporate insiders are not relieved of their duty to disclose material information where that information has received only brief mention in a few poorly-circulated or lightly-regarded publications. The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders. In order to avoid Rule 10b–5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations.

*In re Apple Computer*, 886 F.2d at 1116.

Although defendants only cite two pieces of evidence to demonstrate that the market was aware that Compaq's competitive position was disadvantaged by its lack of direct customer support,[21] after a thorough review of the parties' submissions the court has located several additional articles evidencing the market's awareness of this fact.[22] Because plaintiffs have introduced no contrary evidence the court concludes that defendants have met their summary judgment burden of showing that this information was "credibly" available to the market.[23] Since this market awareness relieved management of its duty to disclose such information, management's silence about the effect of customer service dissatis-

---

**20.** For example, in one of plaintiffs' own exhibits, an analyst takes pains to expose the falsehood of management's disclosure concerning the effect of currency exchange rates. Charles R. Wolf, *Equity Research*, (First Boston), Oct. 25, 1990, (Plaintiffs' Exhibit 76). *See also* Defendants' Exhibit 120, which collates many of the relevant portions of other exhibits into a coherent format.

**21.** *See* Compaq Computer Corp., Form 10–K, Defendants' Exhibit 54, at 6 (containing a single sentence referring to the lack of direct customer support); Defendants' Exhibit 60 at GS–8 (an undated interview presented without benefit of detailed publication information containing a single reference to a customer satisfaction survey placing Compaq near the bottom of the list).

**22.** *See, e.g.,* Mark Ivey, *Doing Unto Compaq as it did Unto IBM*, **Business Week**, Nov. 19, 1990, at

130, Defendants' Exhibit 77 (Compaq's "single-minded dedication to selling through dealers makes it harder for customers to get the after-sale services they want."); Andrew J. Neff, *Compaq Computer (CPQ–72)*, (Bear Stearns), Feb. 15, 1991 (Tab C to Defendants' Exhibit 120), at 2 ("Compaq has often been criticized by the trade because customers had to go through dealers in order to get questions answered....").

**23.** The term "credibly" available to the market gained popularity after it was used by the Supreme Court in *Basic*, 485 U.S. at 248–49, 108 S.Ct. at 992. The Ninth Circuit described this facet of the truth-on-the-market defense by demanding that the counter-information be "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *In re Apple Computer*, 886 F.2d at 1116.

faction cannot support a finding of liability because the essential element of a material misrepresentation is lacking. *See Basic,* 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). However, because defendants have not directed the court's attention to any documents publicly available during the class period that refer to the effect that dealer consolidation would have on Compaq, the court concludes that defendants have not met their summary judgment burden on this type of information.

### 3. Projections and optimism

■ Liability under § 10(b) and Rule 10b–5 may be predicated on publicly released, forward-looking predictions and vaguely optimistic statements.[24] Plaintiffs allege that defendants made misleading or false projections concerning future market share, revenue, and earnings. (Complaint ¶¶ 41, 45, 52, 61, and 68) Defendants argue that the Ninth Circuit's test, that "[p]laintiffs may defeat summary judgment only by showing a genuine issue of fact with regard to a particular statement by [the defendants],"[25] is not met in this case because no individual statement complained of by plaintiffs contains a literal inaccuracy or is rendered misleading by a material omission related to the subject of the statement.

The Fifth Circuit has explained, however, that "reviewing the context in which a disclosure appears is an essential part of determining the disclosure's adequacy." *Isquith,* 847 F.2d at 201.[26] Under *Isquith* particular dis-

closures are reviewed by determining "whether the information disclosed would have been misleading on those points about which the information's adequacy is questioned to a reasonable potential investor who read the information [then available] as a whole." *Id.* at 207. To determine whether a particular disclosure was adequate as a matter of law when made a court must employ a three-part test: (1) determine the scope of the duty to disclose, (2) examine the statements actually made, and (3) compare the minimum required to the actual. *Id.* at 208. In *Isquith* the court also suggested that liability for projections should be "determined by examining the nature of the prediction—with the emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis." *Id.* at 204.

■ Plaintiffs allege that defendants issued a series of misleadingly positive forecasts about Compaq's revenue, market share, and earnings while defendants possessed information that contradicted or, at a minimum, seriously undermined their confidence in the figures that management portrayed. Plaintiffs allege that as early as September of 1990 Compaq's management knew that the company would have to implement significant marketing changes if it hoped to achieve parity between the financial results of the first quarter of 1991 and the first quarter of 1990. Plaintiffs argue, and the summary judgment evidence demonstrates, that management produced a variety of internal forecasts that were continually updated as condi-

---

24. "[P]rojections and general expressions of optimism may be actionable under the federal securities laws." *In re Apple Computer,* 886 F.2d at 1113. *See also Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 203–06 (5th Cir.1988) *cert. denied* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988) (discussing when projections can be actionable); *Wielgos,* 892 F.2d at 512–16 (same); Dennis, *supra,* note 8 (examining development and utility of imposing liability for misleading projections).

The SEC has promulgated two "safe harbor" rules, Rule 175, 17 C.F.R. § 230.175 (promulgated under the Securities Act of 1933) and Rule 3b–6, 17 C.F.R. 240.3b–6 (promulgated under the '34 Act). Both rules protect "forward looking" projections of future financial performance contained in mandatory disclosure documents,

including future revenue, income (loss) earnings (losses) per share, operations plans, and other information. However, the protection can be lost if the statements were made or reaffirmed at a later date without a reasonable basis or without good faith. *See, e.g., Wielgos,* 892 F.2d at 512–14 (Rule 175); *Arazie v. Mullane,* 2 F.3d 1456, 1465–66 (7th Cir.1993) (Rule 3b–6).

25. *In re Apple Computer,* 886 F.2d at 1118.

26. The court stated that "[g]enerally, like materiality, determining whether information has been adequately disclosed is a mixed question of fact and law and, therefore, is a question for a jury.... [A court should] only remove the question from the jury if the disclosure is so obvious that reasonable minds cannot differ." *Id.* at 208.

tions changed. (Plaintiffs' Opposition at 10–15 & exhibits cited there) Plaintiffs' evidence demonstrates that these projections differed from the estimates and projections announced to the public through press releases and SEC required disclosure statements. For example, ¶ 54 of the Complaint quotes a statement of defendant, Ekhard Pfeiffer,[27] Compaq's Executive Vice President and Chief Operating Officer, that the company expected its domestic revenue to exceed general market growth of 5–7% in 1991 even though plaintiffs' summary judgment evidence shows that by January of 1991 internal company forecasts predicted a decline in revenue.

Plaintiffs also allege that while in possession of these internal forecasts, as well as the more concrete operational and marketing plans that the company intended to pursue to meet its internal projections, management disseminated a series of vague optimistic statements that were misleading because they failed to adequately disclose the specific risks, such as decreasing earnings per share, that could result from the failure of the plans to achieve management's hopes. For example, at ¶¶ 40 and 41 of the Complaint plaintiffs quote defendant, Robert R. Canion, Compaq's President, Chief Executive Officer and a director, as stating in December of 1990: "We continue to be optimistic from a company standpoint ... [and] believe that 1991 will be another good year.... We expect to be [gaining market share next year.] We have plans in place that we believe will allow us to gain market share."[28]

Although the disclosures that contain optimistic statements also contain cautionary language, the court is not persuaded that these inclusions justify the conclusion, at the summary judgment stage, that the statements "bespoke caution" as a matter of law. Statements must contain more than vague cautionary language concerning such broad factors as competition, economic recession and foreign exchange rates to "bespeak caution." Cf., e.g., In re Marion Merrell Dow, 1993 WL 393810 at *7–9 (denying motion to dismiss for failure to show that disclosure bespoke caution where statements lacked specific cautionary language). The statements plaintiffs have identified contain no mention of the specific risks envisioned by management, and the court has found no mention in publicly disclosed material available during the class period that management's plans to increase market share and revenue in 1991 could lead to a decrease in earnings per share. Nor has the court found any public disclosure concerning the company's need to engage in marketing practices that were unprecedented for Compaq[29] during the first quarter of 1991 to maintain its financial position. The facts disclosed by management failed to state that the company's financial performance in 1991 may deviate from the ordinary cycle of quarterly performance as a result of the aggressive marketing campaign planned for the first quarter.[30]

27. Although defendants vehemently argue and submit documentation intended to show that this article misquoted Mr. Pfeiffer, the court is unable, in the context of a motion for summary judgment, to resolve the factual dispute concerning the accuracy of the report. Moreover, although defendants argue that neither Mr. Pfeiffer nor any other defendant was obligated to correct the mistake of a third party media person, the court notes that Compaq did not retract the report. The market therefore may have been justified if it relied on the misstatement.

28. The interview in which this statement appears is reprinted as Defendants' Exhibit 60. Similarly optimistic statements are alleged in the Complaint at ¶¶ 46, 47, 48, 53, 54, 62, 64, 68(a), (d), (e), (f), and 73.

29. See Plaintiffs' Exhibit 34 at 1 (notes of sales operation meeting characterizing promotional devices employed during March of 1991 "a first for the Company").

30. Although defendants argue that all of these matters were widely known, they have not brought forward any evidence to show that, in fact, the market was aware of them. For example, defendants have not introduced evidence demonstrating that they disclosed the nature of loan guarantees and other flexible financing terms the company extended to its dealers during the March 1991 promotion. Nor have defendants demonstrated (although they have produced some evidence) that the end-user market was unsaturated when Compaq embarked on a campaign that defendants admit was designed to build up an increased inventory level at its dealers. On the other hand, plaintiffs have introduced Ms. Preston's affidavit to raise a genuine issue of fact that these undisclosed items constituted material information. See Plaintiffs' Exhibit 71, ¶¶ 30–36, 46–53.

Nor is the court persuaded by defendants' argument that they had no duty to disclose internal projections and operational plans. Assuming *arguendo* that no separate duty to disclose internal projections and operations plans existed,[31] defendants must still rebut all inferences raised by the evidence that their statements were made in bad faith or without a reasonable basis. From the court's examination of the evidence there remain genuine issues of material fact whether the adverse nonpublic information described by plaintiffs was in the minds of the speakers when they published statements contradictory to that information, and if not, whether the fact that they ignored this information undermines an otherwise reasonable basis for their predictions and optimism. The court does not conclude, as argued by defendants, that these statements are too vague to rise to the level of material misrepresentations as a matter of law. Since the court must examine the statements in the context in which they were made, and all of these statements were disseminated in a variety of articles, press releases and other materials containing specific projections, the court concludes that there exists a genuine issue of material fact whether the statements are the type that a reasonable investor would have considered significant at the time.[32]

After a thorough review of all of the summary judgment evidence the court concludes that a genuine issue of material fact exists concerning defendants' liability for the allegedly false or misleading nature of the defendants' publicly released projections and the vaguely optimistic statements of certain Control Person Defendants when these statements are viewed in light of all of the information that was disclosed to the market and the information that was available only to management at the time each was made.

### 4. Historical facts

Plaintiffs complain that certain statements containing facts about the company's historical performance are inadequate because they were false or misleading or both.[33] Alternatively, plaintiffs allege that defendants breached their duty to continually update their disclosures to make them not misleading as soon as additional information became known. The Complaint contains allegations about a number of allegedly false or misleadingly disclosed historical items: reasons for order backlog, ¶ 48; reasons for price cuts, ¶¶ 53 and 62; domestic market share increases, ¶ 67; unit shipment increases, ¶¶ 68(b), (d), (f), 71, and 78; and revenue increases, ¶ 71. Defendants argue that each of the statements is technically accurate. However, in light of the undisclosed and potentially material information identified in Part IV.B.3, *supra*, the court is unable to conclude that the actual disclosures were adequate as a matter of law when viewed in context as required by *Isquith*.[34]

*Isquith* demands that actual disclosure be compared with the minimum disclosure required by law to determine its adequacy. Disclosures of historical facts must not only be technically accurate, but must also not be

---

31. Because management had a duty to speak the full truth once it began speaking, it may have had such a duty. *See, e.g., In re Rasterops Corp.*, 1993 WL 476661 at *13 (duty to disclose internally known adverse information arose once management issued positive forward-looking statements). Additionally, because the disclose-or-abstain rule may have been implicated by the Control Person Defendants' decisions to sell stock in February of 1991, Pfeiffer's statement, issued on January 31, 1991, may implicate such a duty for those defendants who traded even though plaintiffs have not identified any trades involving Pfeiffer during the relevant period.

32. *See Basic Inc.*, 485 U.S. at 232, 108 S.Ct. at 984; *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989) (reversing summary judgment for speaker that termed an investment a "sure thing" because "[w]hat might be considered innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation").

33. *See, e.g., Kas v. Caterpillar, Inc.*, 815 F.Supp. at 1170 (action based on historical statements can survive motion to dismiss by alleging that the statement "is either false or misleading because of . . . omitted information.").

34. Even under the statement by statement approach, historical statements must be viewed in context when they are coupled with other potentially misleading statements. *In re Rasterops Corp.*, 1993 WL 476661 at *12.

misleading and must be updated if material information learned later would make them misleading.[35] Plaintiffs allege that the public announcement on April 25, 1991, of revenue and sales figures for the first quarter were inaccurate because management may have failed to properly account for the effects of dealer inventory overstock, special cash incentives, extended payment terms, loan guarantees, price-protection, and liberal return policies. Furthermore, plaintiffs allege that these inaccuracies may have been aggravated by management's failure to properly account for and to properly disclose its reserves for expected returns and price-protection. Plaintiffs also argue that these inaccuracies caused the April 25, 1991, figures themselves to be misleading and to reinforce earlier optimistic statements. Plaintiffs argue that the misleading nature of these statements remained uncorrected until May 14, 1991, when management publicly announced that the company's financial performance in the second quarter would be significantly worse than originally projected.

Defendants argue that plaintiffs' summary judgment evidence is insufficient to support these allegations. However, even though testimony and documents submitted by defendants contradict some of plaintiffs' evidence, the court is not persuaded that defendants' submissions negate the genuine issue of material fact that the figures publicly released may not have accurately reflected the information available to management throughout the relevant time period.

Some of plaintiffs' evidence is not contradicted at all.[36] Additionally, some of plaintiffs' evidence casts doubt on defendants' contention that it promptly disclosed the disheartening second quarter projections as soon as they became aware of the facts.[37] For purposes of this motion, plaintiffs' evidence must be believed and all justifiable inferences from that evidence must be drawn in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus, the court cannot ignore the reasonable inferences raised by plaintiffs' evidence that these non-publicly disclosed factors affecting financial statement preparation resulted in misleadingly inadequate disclosure.

The fact issues concerning the veracity and propriety of management's statements relating to the impact of its sales promotion on publicly released financial performance data, and more importantly, about when management became aware of the results that promotion actually achieved, preclude summary judgment. Without knowing whether management's figures accurately reflected the need to discount the first quarter's results by the allegedly known effects of the price cut and other promotional devices—including the inventory build up—it is impossible to determine whether management fulfilled its duty to disclose only accurate information and to continually ensure its accuracy by comparing the actual disclosure to the minimum required disclosure.

**35.** Rule 10b–5 states that it is unlawful both to make untrue statements of fact and to fail to "state a material fact necessary to make the statements made, in light of all the circumstances in which they were made, not misleading." The rule obligates declarants to continually update their prior statements to avoid liability when new material information may make them misleading.

**36.** *See, e.g.,* Plaintiffs' Opposition at 20 and supporting evidence (allegation that the fact that Compaq's largest dealer, Computerland, was given a greatly expanded term to pay for product during the March incentive program's operation was never disclosed to the market is unchallenged by defendants).

**37.** *Compare, e.g.,* Defendants' Reply Memorandum in Further Support of Defendants' Motion for Summary Judgment (Docket Entry No. 57 at 9) and exhibits cited therein ("Against all expectations, Compaq discovered when it received and analyzed the numbers in mid-May that end-user sales volume was *not* increasing."), *with* Plaintiffs' Exhibit 1, Young Deposition Transcript, at 246 (questioning deponent about statement attributed to Compaq management that "April demand is coming in weak (as expected) due to March channel load.") *and* Plaintiffs' Exhibit 34, at 1 (sales operations meeting notes dated April 12, 1991, stating that the first quarter 1991 "sales promotion enabled Compaq to achieve financial revenue goals for the quarter. However, because channels have been stuffed with 1–2 months of inventory, the cycle, showing cratering demand for the first two months of the quarter [by 'stuffing the channels' with inventory they cannot sell] continues.").

## V. *Conclusion*

Because plaintiffs have pleaded all of their fraud based allegations with sufficient particularity, defendants' motion to dismiss for failure to comply with Fed.R.Civ.P. 9(b) (Docket Entry No. 23) is **DENIED.**

Because plaintiffs have failed to produce evidence sufficient to raise a genuine issue of material fact as to the necessary element of reliance concerning defendants' (1) failure to disclose global information,[38] and (2) failure to disclose the extent to which the company's lack of direct customer service support had a negative effect on financial performance,[39] defendants' motion for summary judgment (Docket Entry No. 23) is **GRANTED** to the extent that it seeks to preclude plaintiffs from obtaining recovery for such conduct under § 10(b) of the '34 Act and SEC Rule 10b–5. Because plaintiffs have produced evidence sufficient to raise a genuine issue of material fact on each of the elements of the remainder of their claims, defendants' motion for summary judgment is **DENIED** as to them.

---

**38.** *See* discussion, *supra,* Part IV. B.1.

**39.** *See* discussion, *supra,* Part IV. B.2.