190 F.3d 609 (4th Cir. 1999)
 LIONEL PHILLIPS, on behalf of himself and all others similarly situated, Plaintiff-Appellant,
v.
LCI INTERNATIONAL, INCORPORATED; H. BRIAN THOMPSON, Defendants-Appellees, SECURITIES & EXCHANGE COMMISSION, Amicus Curiae.
 No. 98-2572
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: June 7, 1999
Decided: September 15, 1999
Filed: September 29, 1999
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Chief District Judge.[Copyrighted Material Omitted]
 COUNSEL ARGUED: Douglas Michael Palais, MEZZULLO & MCCAND-LISH, P.C., Richmond, Virginia, for Appellant. Walter Estes Dellinger, III, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellees. ON BRIEF: Frederic S. Fox, Christine M. Comas, KAPLAN, KILSHEIMER & FOX, L.L.P., New York, New York; Andrew N. Friedman, Lyn M. Rahilly, COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C., Washington, D.C., for Appellant. Martin Glenn, Achilles M. Perry, O'MELVENY & MYERS, L.L.P., New York, New York; Michael J. Chepiga, David B. Smallman, Felecia L. Stern, SIMPSON, THACHER & BARTLETT, New York, New York, for Appellees. Harvey J. Goldschmid, General Counsel, David M. Becker, Deputy General Counsel, Eric Summergrad, Principal Assistant General Counsel, Nathan A. Forrester, Attorney Fellow, SECURITIES & EXCHANGE COMMISSION, Washington, D.C., for Amicus Curiae.
 Before WIDENER and MOTZ, Circuit Judges, and HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Widener and Judge Howard joined.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 As of February, 1998, LCI International was the nation's seventh largest long-distance telecommunications company, providing voice and data transmission services to residential and business customers. LCI had a major customer base, operating system, and sales force, but lacked a substantial transmission network. Qwest, a rival telecommunications company, had built an extensive fiber optic network, but lacked a commensurate base of customers, systems, and sales force. By March, 1998, the two companies agreed that a merger would benefit both and announced that Qwest would acquire LCI in a stock for stock merger valued at over $ 4.4 billion, making the merged company the fourth largest long-distance company in the United States. The question presented here is whether a public statement by LCI's chief executive that "[w]e're not a company that's for sale," made less than a month before Qwest acquired LCI, violated federal securities laws. Because we find that, in context, the statement was not a material misstatement made with the intent to defraud, we affirm the district court's dismissal of this action brought by dissatisfied former LCI stockholders.
 
 I.
 
 2
 Relying on the proxy statement issued to LCI shareholders in connection with the merger and certain press statements, the complaint alleges the following facts.
 
 
 3
 In October, 1997, Joseph P. Nacchio, President and CEO of Qwest, approached H. Brian Thompson, Chairman of the Board and CEO of LCI, at an industry trade convention and proposed that Thompson consider a merger of the two companies. During October and November, Phillip F. Anschutz, Chairman of the Qwest Board, discussed with Thompson the concept of a merger between the two companies.
 
 
 4
 Starting at the end of October, officers from the two companies began meeting to further discuss a possible merger. On November 27, Anschutz proposed to Thompson that Qwest and LCI begin reciprocal due diligence and begin negotiating a merger of the two companies in which Qwest would acquire LCI in a stock for stock merger. Even though LCI was larger than Qwest, the market value of Qwest was substantially higher than LCI.
 
 
 5
 On December 8, LCI Executive Vice President of LCI Joseph Lawrence met with officers of Qwest and investment bankers representing each party. On December 11, Nacchio sent a letter to Thompson, stating that Qwest "was prepared to begin its due diligence investigation immediately in order to be in a position to sign a definitive merger agreement within two weeks." This letter also stated that Qwest would be prepared to offer each shareholder, subject to due diligence and satisfactory negotiation of a merger agreement, $36 worth of Qwest stock for each share of LCI stock.
 
 
 6
 The LCI Board met on December 15 to discuss the offer and concluded that Qwest's offer did not merit a substantive response. On December 16, LCI's Lawrence sent Qwest's Nacchio a letter advising him the LCI Board had considered the offer but that "LCI was not for sale." The letter further indicated that in order for the LCI Board to consider a sale of LCI, an offer would have to be substantially higher than $36 per share.
 
 
 7
 On February 17, 1998, LCI publicly reported its fiscal fourth quarter earnings. LCI's Thompson was interviewed by the Dow Jones News Service in connection with the earnings announcement. Thompson is quoted as stating that "[w]e're not a company that's for sale." The article also states that "[Thompson] said[that LCI] was more of a buyer than a seller in a telecommunications industry that is rapidly consolidating."
 
 
 8
 Two days later on February 19, LCI received another letter from Anschutz at Qwest indicating that his company was prepared to offer $40 worth of Qwest stock for each share of LCI stock, subject to a due diligence investigation. As in December, Qwest stated that "it was prepared to begin its due diligence investigation immediately in order to sign a definitive merger agreement within two weeks." On February 23, LCI's Board of Directors, assisted by legal counsel and investment bankers convened via conference call to discuss the Qwest letter. At that meeting, the LCI board directed its legal counsel to negotiate a confidentiality agreement with Qwest pursuant to which each party would conduct due diligence of the other; that agreement was signed on February 26, 1998. During the next two weeks, representatives of LCI and Qwest undertook due diligence and negotiated the terms of the agreement.
 
 
 9
 On March 8, both Boards approved the final merger agreement. That agreement provided that Qwest would acquire LCI in a stock for stock merger, with LCI shareholders receiving as consideration $42 worth of Qwest stock for every share of LCI stock exchanged. At the LCI Board meeting, Thompson voted against the merger because he "believed that LCI could continue to prosper as an independent company under its current management." Thompson later announced that he wished to vote in favor of the merger, and consequently changed his vote.
 
 
 10
 After the Boards of LCI and Qwest approved the merger, the companies informed the public of the agreement. On March 9, Thompson and Qwest President Nacchio were interviewed on the Cavuto Business Report. The executives were asked "What got the talks going?" Nacchio stated that "We started talking a couple of months ago . . . on a sincere basis and I guess it accelerated about three weeks ago." Thompson immediately responded "Yes." On the same day, on CNN Moneyline with Lou Dobbs, the host questioned "You have been talking to each other for how long?" Thompson replied, "Talking to each other? It goes way back, but really in earnest for the last three or four weeks."
 
 
 11
 On April 3, 1998, Lionel Phillips and others (collectively, the stockholders) purportedly representing the class of LCI shareholders that sold their stock after Thompson's February 17 statement but before the public announcement of the merger on March 9, filed this action against LCI and Thompson. The stockholders allege that when on February 17, Thompson stated that LCI was "not a company that's for sale," LCI was in fact in ongoing negotiations to be acquired by Qwest. They maintain Thompson's statement constituted a material misrepresentation designed to defraud the market by artificially depressing the value of LCI stock. As proof of the falsity of Thompson's statement and his intent to defraud, the stockholders cite the post-merger interviews in which Thompson and Nacchio admitted that the parties had been "talking" on a "sincere basis" for three or four weeks prior to the March 9 interview. (Thompson made the statement in question on February 17, exactly three weeks before the March 9 interview.) Finally, they allege that Thompson's statement had the effect he desired--artificially depressing the price of LCI stock--in violation of § 10(b) of the Securities Exchange Act, 15 U.S.C.A. § 78(j)(b) (West 1997), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1998), and that the stockholders, based on the publicly available information that LCI was not for sale, sold their stock at the artificially depressed price.
 
 
 12
 The district court dismissed the stockholders' original complaint on July 20, 1998, and their amended complaint on September 30, 1998. The stockholders appeal.
 
 II.
 
 13
 In order to prevail on a § 10(b) and a Rule 10b-5 claim, the plaintiff carries the burden of proving:
 
 
 14
 (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.
 
 
 15
 Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 208 (4th Cir. 1994). If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a § 10(b) claim. See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968) (en banc).
 
 
 16
 The district court held that the stockholders' complaint failed to meet this initial requirement. First, the court concluded that Thompson's statement was not false because the "merger" of LCI and Qwest did not constitute a "sale." The court explained that a sale "is generally considered to occur when cash is tendered to shareholders in exchange for their shares in order for one company to assume control over the other," while a merger is "the combination of two corporations after which one of the corporations carries on the combined business and the other ceases to exist in separate form." Because Thompson never stated that LCI was "not due to be acquired through a merger," the district court concluded that his statement was not false.
 
 
 17
 In so doing, the district court looked to the definitions of sales and mergers made in a corporate treatise. See 1 Byron E. Fox & Eleanor M. Fox, Corporate Acquisitions and Mergers § 2.02 [3] (Supp. 1988). Because Qwest had tendered no cash to LCI, the district court found Qwest's acquisition of LCI for stock did not constitute a sale. Therefore, even assuming Thompson knew LCI was actively engaged in merger negotiations, his statement that LCI was "not for sale" was held not to be false.
 
 
 18
 We do not believe that a violation of the securities laws should rest on such a technical and narrow definition of "sale," particularly in view of the stockholders' well founded allegations that LCI management itself used "sale" as a synonym for "merger." Both the proxy statement issued to LCI shareholders and the press reports of the merger relating statements by LCI officers interchangeably use the terms "sale" and "acquired by merger." Moreover, the Supreme Court has expressly held that, for the purpose of § 10(b)'s requirement that statements be made "in connection with a purchase or sale," the term "sale" includes an exchange of one company's stock for that of another in the course of a merger or exchange. See SEC v. National Sec., Inc., 393 U.S. 453, 467-68 (1969). Indeed, a narrow definition of "sale" would seem to run counter to the intent of the securities laws --to protect a "reasonable investor" from fraud. See Basic v. Levinson, 485 U.S. 224, 231 (1988). For a court to look only to a corporate treatise to define an element of an allegedly fraudulent statement would transform the "reasonable investor" standard to that of a "reasonable corporate lawyer."
 
 
 19
 Nor do we find persuasive the district court's reasoning as to materiality. The court held that Thompson's statement was not material as a matter of law because "[e]very investor knows or should know that at the right price, and under certain circumstances, any publicly-held company can be for `sale.' Thompson's statement was not a guarantee that LCI was not for sale." This conclusion seems to us to be a variation on the infamous statement in Flamm v. Eberstadt, 814 F.2d 1169 (7th Cir. 1987). There the court held that misstatements about merger negotiations were immaterial as a matter of law because "[a]t the right price, any corporation is for sale." Id. at 1179. Basic substantially undercuts the force of such aphorisms. Although in Basic the Supreme Court did not expressly disapprove of such rationales, it did clearly state that the materiality of statements involving merger negotiations required a "fact-specific" inquiry that "depends on the significance the reasonable investor would place on the . .. misrepresented information," and explicitly rejected the view adopted by the Flamm court that merger discussions do not become material until the merger partners have agreed in principle as to price and structure. Basic, 485 U.S. at 233-41.
 
 
 20
 Basic directs that materiality of statements as to mergers be assessed by evaluating the probability of the merger reaching fruition and the magnitude of the proposed merger. Id. at 238. Probability is to be ascertained by examining "indicia of interest in the transaction at the highest corporate levels"; magnitude is to be assessed by considering "the size of the two corporate entities and of the potential premiums over market value." Id. at 239-40. Here the stockholders allege high-level negotiations between named managers and directors from both companies, involvement of investment bankers by both parties, and an earlier offer by Qwest to acquire LCI for $36 per share. Moreover, the merger resulted in a $4.4 billion merged company. Thus, it appears that allegations similar to these could, in the appropriate case, satisfy the materiality requirement.
 
 
 21
 In sum, we do not believe the district court's rationale for dismissing this complaint withstands scrutiny.
 
 III.
 
 22
 Nevertheless, we agree with the district court that the stockholders' complaint fails to allege a misrepresentation of material fact. The complaint rests on mischaracterizations of the public record, exaggeration of a single statement, and isolation of that statement from its context and from the wealth of other information publicly available when it was made. Of course, factual allegations must be true to provide the basis for a cause of action, see generally In re Verifone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993); hyperbole and speculation cannot give rise to a claim of securities fraud. See Biechele v. Cedar Point, Inc., 747 F.2d 209, 216 (6th Cir. 1984) ("Mere speculation may not be the basis of section 10(b) liability."). Moreover, the Supreme Court has repeatedly cautioned that allegedly fraudulent corporate statements must be examined in context and in light of the "total mix" of information made available to investors. Basic, 485 U.S. at 231-32; TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). If what Thompson actually said here is examined in the context of all of the information publicly available, we believe that a reasonable factfinder could not conclude that the contested statement constitutes a material misrepresentation.
 
 
 23
 The stockholders' essential claim, as alleged in their complaint, is that Thompson "unequivocally and publicly stated that LCI was not for sale," while in fact "LCI was, at the time of the statement, engaged in serious merger negotiations with Qwest Communications International, and had been for some time." The allegations that the stockholders make to support that claim are not based on any confidential or private information. Rather, they avow exclusive reliance on the public record. Unfortunately, perhaps because facts in the public record often undercut their fraud claim, they occasionally mischaracterize those facts.
 
 
 24
 The stockholders do recognize and allege that according to the proxy statement filed with the SEC and provided to LCI stockholders in December 1997 (two months before Thompson's assertedly fraudulent February statement), LCI in fact rejected Qwest's merger offer after some months of tentative negotiations, stating that "LCI was not for sale." This rejection, in language identical to the February statement, seems to undermine the stockholders' allegation of continuing negotiations between LCI and Qwest. Perhaps anticipating this, the stockholders further allege that "according to the Proxy Statement" in the letter in which LCI rejected Qwest's December merger offer, LCI told Qwest that "LCI would definitely consider a higher proposal given the strategic benefits of the proposed deal." In fact the proxy statement actually says:
 
 
 25
 . . . by letter dated December 16, 1997, Mr. Lawrence [of LCI] advised Mr. Nacchio [of Qwest] that the LCI Board had given careful consideration to the December 11th Letter, but that LCI was not for sale. Mr. Lawrence's letter further indicated that in order for the LCI Board to consider a sale of LCI, an offer would have to be substantially in excess of the value indicated in the December 11th Letter in order to reflect LCI's long-term value. Mr. Lawrence also noted that the December 11th Letter was vague or silent with respect to a number of material terms, and that the LCI Board did not believe it was in the interest of the LCI Stockholders to comment further at that time.
 
 
 26
 Thus, contrary to the allegations in the complaint, according to the proxy statement, LCI's rejection letter does not mention the "strategic benefits" of a merger with Qwest or that LCI"would definitely consider a higher proposal" from Qwest.
 
 
 27
 In the paragraph immediately following this mischaracterization and immediately prior to the description of Thompson's allegedly fraudulent February statement, the complaint alleges that, again "[a]ccording to the Proxy Statement, Qwest, through Anschutz, advised LCI, in response to LCI's concern that Qwest's original offer was too low, that Qwest was prepared to raise its $36 offer by at least $4 to a minimum of $40 per share of LCI common stock." The stockholders' placement of this information in their complaint leads a reader to infer that the offer to raise the share price occurred chronologically between the initial negotiations and the February statement; however, this inference is without support in the public record. Rather, the proxy statement actually relates that "[b]y letter dated February 19, 1998 [two days after issuance of the allegedly fraudulent statement]," Qwest advised the LCI Board of Qwest's willingness to up the offer to $40 per share.
 
 
 28
 Furthermore, Thompson's statement itself belies the stockholders' contention that Thompson "publicly denied any negotiations were ongoing," and for this reason, the statements and "facts in Basic bear a striking resemblance to those here." Brief of Appellant at 23 and 21 n.11. The sole asserted basis for the claim of securities fraud in this case is the purportedly fraudulent statement that: "[w]e're not a company that's for sale." That statement does not "publicly deny any ongoing negotiations." Nor does it "resemble" the Basic statements. In Basic, the defendant corporation issued three statements, which said (1) the corporate officers "knew no reason for the stock's activity and that no negotiations were underway with any company for a merger;" (2) "management is unaware of any present or pending company development that would result in the abnormally heavy trading activity and price fluctuation;" and (3) "we remain unaware of any present or pending developments that would account for the high volume of trading and price fluctuations in recent months." Basic, 485 U.S. at 227 n.4. Thus in Basic, the company flatly denied any "awareness" of any "developments"--present or pending--that would affect the price or volatility of the company's stock and specifically denied that the merger "negotiations were underway."
 
 
 29
 Similarly, in the only other case that the stockholders cite in which shareholders of a publicly-held corporation were found to have stated a securities fraud claim solely on the basis of asserted misrepresentations about merger negotiations, corporate officers had repeatedly "denied the existence of any merger negotiations" and stated that they "were not currently engaged in any" such efforts. In re Columbia Sec. Litig., 747 F. Supp. 237, 240 (S.D.N.Y. 1990). Thompson's "[w]e're not a company that's for sale" statement contains no equivalent blanket denial of awareness of any merger negotiations, let alone, any explicit assertion that the company was not presently engaged in such negotiations.
 
 
 30
 Nor do the remarks Thompson made in the post-merger interviews on March 9 provide support for the stockholders' assertion that his February "not for sale" statement was materially false like the statements in Basic and Columbia. During the interviews, Thompson acknowledged that Qwest and LCI "started talking a couple months ago . . . on a sincere basis," which "accelerated about three weeks ago." That account tells us nothing about the truth or materiality of the "not for sale" statement. Although the post-merger remarks could be consistent with a hiatus in negotiations after the December rejection and renewal of them with announcement of LCI's strong fourth quarter earnings, if interpreted in the light most favorable to the stockholders, the remarks certainly could support their allegation that merger negotiations were "ongoing" when Thompson issued his February "not for sale" statement. But that is all the post-merger remarks could do and thus they add nothing to the stockholders' case because, for purposes of evaluating the complaint, we assume that the stockholders' allegation as to "ongoing" negotiations is true. The postmerger remarks simply do not transform Thompson's February statement into a flat denial of any merger negotiations like those in Basic and Columbia.
 
 
 31
 Indeed, the stockholders themselves actually seem to recognize that the situation here differs markedly from that in Basic and Columbia. First, they acknowledge in their complaint that at the time of Thompson's statement "the transaction had not yet been finalized and Thompson did not and could not have known whether Qwest would acquire LCI in exchange for cash, or Qwest common stock, or whether the transaction would take some other form"--or, one might add, in view of the December rejection and the yet to be performed due diligence inquiry, whether it would go forward at all. Second, in their reply brief, the stockholders concede that the "[w]e're not a company that's for sale" statement was, as LCI maintains, equivalent to stating that the company was not "in play." See Reply Brief at 1 (stating that LCI "chose to speak about whether LCI was `in play'"). A corporate officer's statement that the company was not "for sale" or "in play" is a good deal different from that officer's express denial of any merger negotiations.
 
 
 32
 Having stripped the stockholders' allegations of mischaracterizations and exaggeration, we focus on whether the exact statement in its true context constitutes a material representation. In arguing that it is, the stockholders do not assert that they actually relied on the statement, but rather they maintain that it had an artificial depressive effect on the market of LCI stock, and therefore was a fraud on the market. See Basic, 485 U.S. at 243-44.
 
 
 33
 Although this fraud-on-the-market theory primarily impacts § 10(b)'s reliance element--by eliminating any need to prove individual reliance on an assertedly false statement--the rationale behind this theory also affects the materiality element--by "shift[ing] the critical focus of the materiality inquiry." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1218 (1st Cir. 1996). Because in a fraud-on-themarket case the "reasonable investor" for materiality purposes is not an individual plaintiff, but the market itself, a statement cannot be material if the hypothetical reasonable investor--that is, the market-would not regard the statement, in context, as significant. The market may well take a more jaundiced view of corporate statements--both optimistic puffery and "holding pattern" statements like the one at hand--than an individual investor. See, e.g., id.; Raab v. General Physics Corp., 4 F.3d 286, 289-90 (4th Cir. 1993) ("[T]he market price of a share is not inflated by vague statements predicting growth . . . . Analysts and arbitrageurs rely on facts in determining the value of security, not mere expressions of optimism."); Glazer v. Formica Corp., 964 F.2d 149, 155 (2d Cir. 1992) ("The mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material.").
 
 
 34
 With this understanding in mind, we examine the other information that was publicly available to reasonable investors at the time Thompson made his February statement. We undertake this examination because "even lies are not actionable" when an investor "possesses information sufficient to call the [mis]representation into question." Teamster Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 529 (7th Cir. 1985). After all, the securities laws impose liability only when there is a "substantial likelihood" that an alleged misrepresentation "significantly altered `the total mix' of information" a reasonable investor (the market) possesses. TSC Indus., 426 U.S. at 449.
 
 
 35
 The Dow Jones article in which Thompson's "not for sale" statement is reported contains a summary of much of this information. We note that although the stockholders failed to attach that article to their complaint (LCI attached it to its motion to dismiss), a court may consider it in determining whether to dismiss the complaint because it was integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity. See Parrino v. FHP, Inc., 146 F.3d 699, 705-06 (9th Cir. 1998); Shaw, 82 F.3d at 1220; Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2nd Cir. 1991). The short article reads, in its entirety:
 
 
 36
 LCI 4Q Rev. Up 30%; Chairman Says Co. Not For Sale
 
 
 37
 -- LCI
 
 
 38
 by Shaw Young
 
 
 39
 NEW YORK (Dow Jones)--After reporting fourthquarter earnings in line with Wall Street expectations on revenue growth of 30%, H. Brian Thompson, Chairman and chief executive of LCI International Inc. (LCI) on Tuesday said his company isn't looking to grow by being bought out.
 
 
 40
 "We're not a company that's for sale," Thompson told Dow Jones. He said the McLean, Va., long-distance company is more of a buyer than a seller in a telecommunications industry that is rapidly consolidating.
 
 
 41
 At the end of December, LCI, the nation's seventhbiggest long-distance carrier, closed a $331.8 million merger with USLD Communications Corp.
 
 
 42
 Including charges from the merger and other nonrecurring items, LCI reported a pro forma fourth-quarter loss of $37 million, or 39 cents a share, on revenue of $446 million. Year-ago pro forma earnings were $23 million, or 23 cents a share, on revenue of $344 million.
 
 
 43
 Excluding one-time items, the company earned 26 cents a share. On a stand alone basis, earnings were 27 cents, as analysts surveyed by First Call Corp. had expected.
 
 
 44
 Thompson said he couldn't yet comment on analysts' predictions for upcoming quarters because those estimates don't yet reflect the merger.
 
 
 45
 Goldman, Sachs & Co. analyst Richard Klugman said in a report earlier Tuesday that he sees the company "posting a sustainable internal growth rate of roughly 25%, a rate that could be augmented by further EPS-accretive acquisitions, similar to the USLD deal."
 
 
 46
 Thompson said he is very pleased with the company's revenue growth and the 31% increase in calling traffic it registered in the fourth quarter.
 
 
 47
 Investors, apparently satisfied with the results, boosted the company's NYSE-listed shares 1 1/8, or 4%, to 29 1/8, on volume of 730,000 shares. Average daily volume is 616,400 shares. The stock is just below the 52-week high of 31 7/16 set Dec. 30.
 
 
 48
 Hence the article demonstrates that reasonable investors would know that: (1) LCI had excellent fourth quarter earnings; (2) the company was trading at very near its year high of 31 7/16 per share; (3) the telecommunications industry was "rapidly consolidating;" (4) LCI had closed a $ 331.8 million merger with another telecommunications company less than two months earlier; and (5) an analyst believed LCI's continued revenue growth was "sustainable" and could be "augmented" by further acquisitions. Furthermore, reasonable stockholders would learn from this article that the author regarded Thompson's "[w]e're not a company that's for sale statement" as an indication that the company "wasn't looking to grow by being bought out." They would also learn, however, that Thompson was not foreclosing further mergers-although he believed the company was"more a buyer than a seller."
 
 
 49
 In none of the cases on which the parties rely, or any other case that we have found, has a statement like that at issue here, made in a context at all similar to this, been found to be a misstatement of material fact. Most of the cases cited by the parties involve claims that the corporation made statements that too optimistically reported on corporate earnings, profits, growth, or other developments. In those cases, the asserted misrepresentation caused the plaintiff shareholders to buy stock at an inflated price and resulted in an immediate loss to them when the too rosy forecasts failed to materialize and the stock's price plummetted. See, e.g., Hillson, 42 F.3d at 207; Raab, 4 F.3d at 286.
 
 
 50
 That scenario presents rather different concerns than the case at hand in which the stockholders claim that a corporate statement artificially depressed the value of publicly traded stock. On the one hand, "depressive" statements cannot be dismissed as mere "puffery"; on the other hand, the effect of such statements on the market may be more difficult to quantify than statements that are too optimistic, because, in themselves, "depressive" statements may cause no actual gain or loss. For example, here the stockholders make no claim the statement caused any actual loss to them or gain to others. And although the complaint does not reveal the price the plaintiff stockholders paid for LCI stock, it does disclose that they sold it in late February and early March 1998 at prices ranging from $33 5/16 to $30 per share. The fact that the stock's 52-week high was $31 7/16 a share as of February 17, 1998, strongly suggests that no plaintiff lost money on the sale of LCI stock. (The stockholders' theory apparently is that they did not realize as much profit as they would have absent the asserted misrepresentation.)
 
 
 51
 Of the more than 80 cases cited by the parties only seven concern allegations like those at issue here, that corporate statements or omissions artificially depressed a stock's value. None of these cases assist us because all involve vastly different facts, i.e., corporations flatly denying any merger possibility, see Basic and Columbia; or corporate insiders allegedly conspiring to drive down the price in order to obtain over $30 million in benefits for themselves, see Pittiglio v. Michigan Nat'l Corp., 906 F. Supp. 1145, 1152 (E.D. Mich. 1995); or judicial rejection of the plaintiffs' claim because merger negotiations were too tentative, see Glazer, 964 F.2d at 149; Taylor v. First Union Corp., 857 F.2d 240 (4th Cir. 1988); Connelly v. General Med. Corp., 880 F. Supp. 1100 (E.D. Va. 1995); or dismissal on other grounds, see Goodwin v. Elkins & Co., 730 F.2d 99 (3d Cir. 1984).
 
 
 52
 We are therefore left without any clear precedent on point. Hence, the strength of the complaint must be resolved simply by analyzing the contested statement in light of the relevant general legal principles set forth above. That analysis requires the conclusion that the "[w]e're not a company that's for sale" statement in the context in which it was made--a report of high fourth quarter earnings and an almost record price for the stock--and in view of the mix of other information available to reasonable investors--including the "rapidly consolidating" nature of the industry and LCI's very recent merger with another company and an analyst's opinion that LCI revenues could be augmented by further acquisitions--was not a misrepresentation of material fact.
 
 
 53
 We recognize that this is a close question. But we cannot conclude that there is a "substantial likelihood that" this statement "significantly altered" the "total mix" of information available to the market as a whole. TSC Indus., 426 U.S. at 449. We find important the fact that in making the statement Thompson did not deny present or future merger negotiations as did management in Basic and Columbia. Rather, although he maintained LCI was not "in play"--"[w]e're not a company that's for sale"--Thompson actually indicated that there would be mergers in the company's future; to be sure he said, according to a reporter, that LCI was "more a buyer than a seller," but Thompson did not foreclose the latter possibility. In an industry known to be "rapidly consolidating," there is no substantial likelihood that the statement, taken in its entirety, significantly altered the total mix of information available to reasonable investors. For these reasons, the district court correctly held that the challenged statement did not constitute a misstatement of material fact.
 
 IV.
 
 54
 In addition to failing to allege a material misstatement, we believe that the stockholders have failed to allege facts that adequately plead scienter.
 
 
 55
 In 1995, Congress enacted the Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67 (1995), which amended the Securities Exchange Acts of 1933, 15 U.S.C.A. §§ 77a-77bbbb (West 1997), and 1934, 15 U.S.C.A. §§ 78a-78lll (West 1997). The PSLRA did not change the standard of proof a plaintiff must meet or the kind of evidence a plaintiff must adduce to demonstrate scienter at trial in a securities fraud case. See In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. July 8, 1999). Thus, to establish scienter, a plaintiff must still prove that the defendant acted intentionally, which may perhaps be shown by recklessness. See Malone v. Microdyne Corp., 26 F.3d 471 (4th Cir. 1994). But in order to "prevent abusive and meritless lawsuits," H.R. Conf. Rep. No. 104369, at 31 (1995), the PSLRA does seek to heighten the standard for pleading scienter, and so "chang[es] what a plaintiff must plead in his complaint in order to survive a motion to dismiss." In re Comshare, 183 F.3d 542, 549.
 
 
 56
 The PSLRA directs that a complaint must, "with respect to each act or omission alleged to violate the chapter, state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2). Nowhere does the PSLRA define this "required state of mind." See In re Baesa Sec. Litig., 969 F. Supp. 238, 240 (S.D.N.Y. 1997). Hence, although the new statute indisputably seeks to make pleading scienter more difficult for plaintiffs, see Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 537 (2d Cir. 1999); In re FAC Realty Sec. Litig., 990 F. Supp. 416, 421 (E.D.N.C. 1997), there is "widespread disagreement among courts as to the proper interpretation of the PSLRA's heightened pleading requirement." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 973 (9th Cir. 1999)
 
 
 57
 The legislative history of the PSLRA refers to the Second Circuit standard. See H.R. Conf. Rep. No. 104-369, at 41 ("The Conference Committee language is based in part on the pleading standard of the Second Circuit."). That standard recognized that a plaintiff may plead scienter by alleging specific facts that either (1) constitute circumstantial evidence of conscious or reckless behavior or (2) establish a motive to commit fraud and an opportunity to do so. See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-69 (2d Cir. 1993). Some courts have held that the PSLRA adopted the Second Circuit's test for pleading scienter. See Press, 100 F.3d at 537 ("The [PSLRA] heightened the requirement for pleading scienter to the level used by the Second Circuit."); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999).
 
 
 58
 Other courts, however, relying on further discussion in the PSLRA'S legislative history have interpreted the PSLRA as instituting an even more stringent standard. See H.R. Conf. Rep. No. 104369, at 41 ("Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting the pleading standard."). For example, in In re Comshare, the Sixth Circuit held that establishing motive and opportunity was insufficient to satisfy PSLRA's pleading requirement, but concluded that a plaintiff could survive a motion to dismiss if he "alleges facts giving rise to a strong inference of recklessness." 183 F.3d 970, 978 see also In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1106 (D. Nev. 1998); In re Baesa, 969 F. Supp. 238. The Ninth Circuit has interpreted the PSLRA still more restrictively. In In re Silicon Graphics, the court held that in order to plead scienter adequately a plaintiff must allege facts "that constitute circumstantial evidence of deliberately reckless or conscious misconduct." 1999 WL 446521, at *1. The court distinguished "deliberate" recklessness from the "simple" recklessness required under the Second Circuit test, describing the former as "facts that come closer to demonstrating intent." Id.
 
 
 59
 We have not yet determined which pleading standard best effectuates Congress's intent. Nor need we do so here because the stockholders have failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA, the two-pronged Second Circuit test.
 
 
 60
 First, they have failed to allege specific facts demonstrating that Thompson's statement gave rise to a "strong inference" that LCI acted with a reckless or conscious effort to defraud. The securities laws generally define recklessness as an act "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Hoffman v. Estabrook & Co., 587 F.2d 509, 517 (1st Cir. 1978) (quoting Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977). Mere negligence is not sufficient to support liability. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 215 (1976). The "allegations of scienter must be based on a substantial factual basis in order to create a `strong inference' that the defendant acted with the required state of mind." Zeid v. Kimberley, 973 F. Supp. 910, 918 (N.D. Cal. 1997). When, as here, a court determines that the complaint "fails adequately to allege that defendants' statements were [materially] false (affirmatively or through omissions), the [c]omplaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making statements." San Leandro Emergency Med. Group Profit Sharing Plans v. Philip Morris Co., 75 F.3d 801, 813 (2d Cir. 1996); see also Zeid, 973 F. Supp. at 924 (holding that because plaintiff failed to prove the alleged misstatements were false, plaintiff cannot demonstrate any facts "to create an inference that Defendants knew the statements were false").
 
 
 61
 Nor does the complaint allege sufficient specific facts of "motive and opportunity" to defraud. Undeniably, Thompson, as Chairman and CEO of LCI, had the opportunity to cause an artificial depression in the price of the stock, see In re Time Warner, 9 F.3d at 269, but his or the company's motive to make such a statement is far more problematic. In order to demonstrate motive, a plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1130 (2d Cir. 1994). Merely alleging facts that lead to a "strained and tenuous inference" of motive is insufficient to satisfy the pleading requirement. Zeid, 973 F. Supp. at 923.
 
 
 62
 The stockholders allegations of Thompson's motive, as stated in the complaint, are as follows:
 
 
 63
 Thompson has a motive to materially misrepresent the existence of negotiations with Qwest to be certain the deal would go through. Thompson's statement served to keep LCI's stock price depressed to ensure that in the midst of serious merger negotiations, Qwest would not be discouraged from acquiring LCI. Indeed, Thompson's subsequent single vote against the deal, which he later changed prior to the public announcement, enabled him to bargain further with Qwest. Qwest wanted to announce that the LCI-Qwest deal has the unanimous approval of both companies' boards of directors, so Thompson held back his vote in favor of the LCI-Qwest deal until Qwest agreed to terms more favorable to him -such as a position for Thompson on Qwest's board of directors, or a higher share price that would inure to his benefit.
 
 
 64
 These allegations present multiple problems. First, the stockholders have, in several respects, apparently alleged facts that misstate the vote on the merger. They assert that Thompson cast the "single vote" against the merger as a bargaining chip to obtain some personal benefit, which Qwest gave to him to persuade him to change his vote prior to public announcement of the merger, so that it could be announced that the LCI board unanimously approved the merger. The proxy statement tells a different story. (Although it was not attached to the complaint, we can consider the proxy statement for the same reasons we have considered the Dow Jones Article. See supra at 13.) According to the proxy statement, both Thompson and another director initially voted against the merger, making the board vote seven to two. The proxy statement further reveals that only after the March 9 announcement of the merger did Thompson and the other director change their votes. That two directors voted against the merger and that neither changed his vote in time for the public announcement of it would, of course, undermine the stockholders' allegation that Thompson's vote was so vital to Qwest that he could use it to extort some benefit for himself.
 
 
 65
 Looking beyond the stockholders' possible mischaracterizations, the stockholders claim that Thompson's motive in issuing the challenged statement was to depress the price of LCI stock to assure the success of the merger. This contention is, of course, totally at odds with Thompson's initial vote against the merger. Why would Thompson commit fraud to facilitate a merger to which he was opposed? Moreover, even if we assume that Thompson's initial vote was a subterfuge, designed to serve his self-interest, as the stockholders contend, their allegations as to Thompson's motive for depressing the stock--to retain a position on the corporation's board and obtain a higher price for his stock--do not constitute or imply an adequate motive to commit securities fraud.
 
 
 66
 Allegations that "merely charge that executives aim to prolong the benefits they hold" are, standing alone, insufficient to demonstrate the necessary strong inference of scienter. See Shields, 25 F.3d at 1130. For this reason assertions that a corporate officer or director committed fraud in order to retain an executive position, or retain such a position with the merged company, simply do not, in themselves, adequately plead motive. See Leventhal v. Tow, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (allegations that "defendants artificially inflated" stock price "to protect and enhance their executive positions and negotiate as favorable a deal as possible in a pending employment contract also fail to give rise to a strong inference of scienter") (internal quotation marks omitted). Similarly insufficient are allegations that corporate officers "were motivated to defraud the public because an inflated stock price would increase their compensation." Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995); see also Melder v. Morris, 27 F.3d 1097, 1102 (5th Cir. 1994) (accepting such allegations as proof of scienter "would effectively eliminate the state of mind requirement as to all corporate officers and defendants"). To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of "personally-held stock" or"insider trading" by the defendant. See Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1312 (C.D. Cal. 1996); see also Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) (holding that allegations of insider trading, in combination with the timing of misrepresentations, satisfied the scienter requirement); Shields, 25 F.3d at 1130. The stockholders make no allegations that Thompson engaged in any such activity.
 
 
 67
 The rationale underlying these holdings is straightforward. Similar situations arise in every merger; thus, allowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions, see Acito, 47 F.3d at 54, every time that company effected a merger or acquisition. See Leventhal, 48 F. Supp. 2d at 115 ("This motive has been rejected routinely."). Because the stockholders' allegations pertain to motivations common to every corporate merger, those allegations cannot demonstrate scienter.
 
 
 68
 Moreover, the allegations that Thompson gained some personal benefit by depressing the price of LCI stock seems totally without logical basis. To be sure, in certain circumstances management may benefit from low share prices. For instance, if management is contemplating a leveraged buy out, see Taylor, 857 F.2d 240, or if management is hoping to close off shareholder dissent by instituting a selftender to attract a white knight, see Pittiglio, 906 F. Supp. 1145, then driving the price of the stock down may further their interests. But the stockholders make no similar allegations in this case.
 
 
 69
 We recognize that Thompson could have been motivated as the stockholders allege. A corporate officer, who owned two million shares of stock in a corporation involved in merger negotiations, could issue a fraudulent statement artificially depressing the stock's price, with the hope that by doing so he could ultimately obtain a higher price when the merger was complete. By the same token, that officer, believing that an acquiring corporation wished to have the unanimous support of the acquired company's board, could temporarily withhold his approval of the merger in order to extort an executive position from the acquirer, even though his vote was neither the sole vote against the merger nor changed in time for the public announcement of the merger. However, we are not called on to decide whether the defendants' actions demonstrate a theoretically possible motive. Rather, the PSLRA requires us to "curtail the filing of meritless lawsuits," H.R. Conf. Rep. 104-369, at 41, by allowing only those suits which demonstrate "a strong inference of scienter" to survive a motion to dismiss. In re Advanta, 180 F.3d at 541 (holding that plaintiffs' allegations "[did] not permit a strong inference of scienter"); see also Epstein v. Itron, Inc., 993 F. Supp. 1314, 1323 (E.D. Wash. 1998) (recognizing that the PSLRA "indicates Congress intended to heighten . . . the quantum of the inference necessary as to defendants' unlawful state of mind").
 
 
 70
 In determining whether the stockholders have established this requisite inference, we may not accept claims of fraud based on "speculation." See O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) (citing Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990)). Moreover, "[o]ne who believes that another has behaved irrationally has to make a strong case." DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990) (emphasis added). We are unwilling to piece together speculative inferences to conclude that Thompson had a true motive to commit fraud. Assuming, as we must, see Shields, 25 F.3d at 1130, that Thompson sought to further his own professional and economic interests, issuing a statement designed to artificially depress the value of LCI stock was not the way any rational person, who owned two million shares of LCI, would further those interests. Cf. In re Health Management, Inc. Sec. Litig., 970 F. Supp. 192, 204 (E.D.N.Y. 1977) (plaintiffs fail to explain "how the desire to conclude various acquisitions by using inflated value of the stock as consideration for mergers . . . is in the informed economic self interest of" individual corporate officers). Irrespective of the actual reasons for Thompson's voting behavior on the merger, the stockholders' allegations, although hypothetically possible, do not provide the requisite "strong inference" of fraudulent intent required under the securities laws. See 15 U.S.C.A. § 78u4(b)(2). Accordingly, the complaint fails to allege specific facts sufficient to demonstrate scienter.
 
 V.
 
 71
 In sum, because the challenged statement, in context, does not constitute a material misstatement with intent to defraud, the judgment of the district court is
 
 
 72
 AFFIRMED.