## In re TREX COMPANY, INC. SECURITIES LITIGATION.

**This Document Relates To: All Actions.**

**No. 7:01–CV–00517.**

United States District Court, W.D. Virginia, Roanoke Division.

May 29, 2002.

any applicable statute of limitations.

Arthur Patrick Strickland, Arthur P. Strickland, P.C., Roanoke, VA, Bernard M. Gross, Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, Stuart Savett, Robert P. Frutkin, Savett, Frutken, Podell & Ryan, P.C., Philadelphia, PA, Kenneth A. Elan, New York City, for Robert Schiller.

Arthur Patrick Strickland, Arthur P. Strickland, P.C., Roanoke, VA, Samuel H. Rudman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Kenneth J. Vianale, Maya Saxena, Milberg Weiss Bershad Hynes & Lerach, LLP, Boca Raton, FL, Charles J. Piven, Baltimore, MD, Paul Geller, Cauley Geller Bowman & Coates, LLP, Boca Raton, FL, Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, Robert P. Frutkin, Savett, Frutken, Podell & Ryan, P.C., Philadelphia, PA, for Douglas C. Wotring.

Arthur Patrick Strickland, Arthur P. Strickland, P.C., Roanoke, VA, Evan Smith, Brodsky & Smith, Bala Cynwyd, PA, for Edilberto Chevere.

William Raymond Rakes, Gregory Joseph Haley, Gentry, Locke, Rakes & Moore, Roanoke, VA, Lisa K. Wager, David G. Rizzo, Morgan, Lewis, & Brockius, LLP, New York City, Christian J. Mixter, Morgan, Lewis & Bockius, LLP, Washington, DC, for defendants.

### MEMORANDUM OPINION

WILSON, Chief Judge.

Plaintiffs bring this action for securities fraud against defendant Trex Company, Inc. ("Trex" or "the Company"), and individual defendants Robert G. Matheny,

Roger A. Wittenburg, Anthony J. Cavanna, and Andrew U. Ferrari (collectively "individual defendants" and, along with Trex, "defendants"), all of whom serve as senior officers and directors of Trex. Plaintiffs seek to represent a class composed of all persons (other than the officers, directors and employees of Trex or its subsidiaries, affiliates and privies) who were damaged by purchasing Trex stock during the period beginning November 2, 2000 and ending June 18, 2001 ("class period"). The Consolidated and Amended Complaint[1] ("complaint") charges violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5) promulgated under that Act, 17 C.F.R. § 240.10b–5, and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The court has jurisdiction under 28 U.S.C. §§ 1331, 1337. Defendants have moved to dismiss the complaint, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[2] Finding that the complaint fails to plead particular facts that create a strong inference of scienter or that indicate that the allegedly fraudulent statements were materially misleading or omissive, the court will grant defendants' motion.

## I. Background

Plaintiffs claim that the individual defendants engaged in a fraudulent scheme throughout the class period to artificially distort the price of Trex securities. The individual defendants allegedly engaged in this scheme in order to secure for themselves annual cash bonuses in 2000 and to satisfy analysts' concerns regarding the Company's ability to meet its fourth quarter 2000 revenue projections. Allegedly at the heart of the fraudulent scheme is the individual defendants' engagement in the beginning of the class period in overly aggressive sales programs referred to in the complaint as "channel stuffing." " 'Channel stuffing' means inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company. It has the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." *Greebel,* 194 F.3d at 202. By offering its customers extraordinary discounts and extended payment terms in the fourth quarter of 2000 and the first quarter of 2001, plaintiffs claim that the individual defendants improperly increased fourth quarter 2000 revenues. Allegedly failing to adequately disclose Trex's sales programs in the beginning of the class period and to revise 2001 revenue projections accordingly, the individual defendants artificially inflated the value of Trex stock until June 2001, when Trex disclosed much lower than expected second quarter revenues. As a result of that disclosure, Trex's common stock price fell $7.98 per share, to close at $18.50 per share on June 19, 2001. The allegations in the complaint and the documents on which the complaint relies further disclose the following about the defendants.

---

**1.** Civil Action No. 7:01CV00517 encompasses four cases that the court has consolidated into one. The named plaintiffs who filed these actions include Robert Schiller (Civil Action No. 7:01CV00517), Douglas C. Wotring (Civil Action No. 7:01CV00537), Edilberto Chevere (Civil Action No. 7:01CV00608), and James Morgan (Civil Action No. 7:01CV00581).

**2.** In deciding a motion to dismiss a securities fraud complaint, a court may rely on public documents quoted by, relied upon, incorporated by reference in, or otherwise integral to the complaint, and that reliance does not convert the motion to dismiss into one for summary judgment. *Phillips v. LCI International, Inc.,* 190 F.3d 609, 618 (4th Cir.1999); *In re MicroStrategy, Inc. Securities Litig.,* 115 F.Supp.2d 620, 623 n. 4 (E.D.Va.2000).

Trex, a Delaware corporation with headquarters in Winchester, Virginia, was incorporated on September 4, 1998 for the purpose of acquiring TREX Company, LLC, which became Trex's wholly owned subsidiary. The individual defendants initiated the commercial activity of TREX Company, LLC on August 29, 1996, by acquiring the Composite Products Division of Mobil Oil Corporation. Trex is the nation's largest manufacturer of non-wood decking material, Trex–Wood–Polymer, which it markets under the brand name Trex. The Company's common stock is traded on the New York Stock Exchange. During the class period Trex sold its product "to 25 wholesale companies operating from approximately 75 distribution locations." (Def.'s Mot. to Dism., Rizzo Aff., Ex. I at 7.) Trex's distributors, in turn, "marketed Trex to approximately 2,600 dealer outlets across the United States." *Id.* Of the 25 wholesale companies that purchase Trex's product, "five ... accounted for approximately 75% of Trex's net sales in 2000." (Compl.¶ 6)

The individual defendants are, and during the class period were, senior executives and directors of Trex: defendant Robert G. Matheny was the President and a Director of Trex; defendant Roger A. Wittenburg was the Executive Vice President of Technical Operations and Material Sourcing and a Director of Trex; defendant Anthony J. Cavanna was the Executive Vice President, Chief Financial Officer, and a director of Trex; and defendant Andrew U. Ferrari was the Executive Vice President of Sales and Marketing and a director of Trex. These defendants allegedly prepared, reviewed, executed, and/or approved, and thereby controlled the content of, Trex's filings with the Securities and Exchange Commission ("SEC"), press releases, and analysts' conference calls. By virtue of their positions, the individual defendants also allegedly exercised total control over the company, and had access to, and knowledge of, material, adverse non-public information including reports regarding Trex's sales transactions, revenue recognition, wholesaler and retailer inventories, and product demand. Plaintiffs also allege that the individual defendants were able to keep track of wholesale and retail sales because Trex shipped product directly to retail dealers and sent employees to retail stores to take inventory. (Compl.¶ 44(a)–(f))

The complaint further alleges the following. Until the third quarter of 2000, demand for Trex's product had generally exceeded Trex's capacity to manufacture it, forcing Trex to "allocate" product to the independent wholesalers to whom it sells its product, allowing the wholesalers to accumulate inventory to protect themselves from shortages. By the third quarter of 2000, Trex's manufacturing capacity caught up with demand, so that Trex no longer needed to allocate product to its wholesale customers. The Company anticipated that some wholesalers would respond to this increased manufacturing capacity by decreasing their inventories.

At the beginning of the class period on November 2, 2000, defendants allegedly knew that they could not maintain their historical rate of growth in the fourth quarter of 2000 because of two factors: stockpiled wholesaler inventories remaining from the Company's allocation period and increased competition in the composite deck products market. Consequently, defendants began "stuffing the channels," *i.e.,* "encouraging Trex's wholesalers, including its largest wholesalers, to purchase larger volumes of product, in the fourth quarter of 2000 and in the first quarter of 2001, than they needed to meet retail demand." (Compl., ¶ 21.)

Defendants initiated a variety of channel stuffing methods. First, Trex employed an "early buy-in program" wherein cus-

tomers paid year 2000 prices for products ordered in 2000 for delivery in 2001. Trex also "extended" the program, charging 2000 prices for orders placed in January 2001 for delivery in March and April. Next, Trex offered a "60 day-dating" program in which customers could pay for their orders up to 60 days after delivery. Distributors could also take advantage of a variety of rebates, some available during December 2000 and others in January–February 2001. "Using these rebates, defendants were able to pull orders into the fourth quarter of 2000 and the first quarter of 2001" (compl., ¶ 22(a)), and caused Trex's wholesalers to stockpile their inventories even further.

Trex issued several statements that the plaintiffs characterize as misleading. On November 2, 2000, the first day of the proposed class period, defendant Matheny reported Trex's financial performance for the third quarter 2000. Matheny noted that the company had increased production capacity by approximately 40%, relieving Trex's need to allocate product to its distributors. Matheny further declared:

> We are pleased with the steady progress of the company as we continue to execute our long-term growth strategy. The strategy balances the demand of business expansion with the need to continue to improve profitability. This quarter's results again demonstrate progress on both fronts . . . .
>
> The elimination of product allocation is clearly a major milestone in our expansion efforts that will have a number of positive impacts, including better customer service and a stronger competitive position. It does, however, create short term challenges as we manage through a transition period that began in September. Dealers who had previously been stockpiling inventories of Trex® material during allocation now realize that this will no longer be necessary. As a result, we are experiencing a

temporary slowdown in new orders as excess inventories at wholesale and retail levels are brought down. Because of the highly seasonal nature of our business, we anticipate that the impact of this temporary slowdown will continue until the normal seasonal demand increases in the first quarter of 2001. At this point, we are estimating fourth quarter 2001 revenues to be similar to or slightly higher than 1999's fourth quarter revenues of $12.3 million. For fiscal 2001, we anticipate revenue growth of approximately 25% as we continue to build out capacity and our marketing program.

Plaintiffs contend that this statement was materially misleading because it failed to disclose Trex's "channel stuffing activities," which were artificially increasing fourth quarter revenues and dealer inventories, and failed to disclose the impact of the increased dealer inventories on 2001 revenues. Matheny's fourth quarter revenues estimate of $12.3 million was, in fact, a reduction in the Company's projected fourth quarter revenue growth. As a result, Trex's common stock price dropped from $36.81 on November 2, 2000 to close at $24.20 the following day.

On November 14, 2000, Trex issued its third quarter 2000 Form 10–Q, signed by defendant Cavanna, which stated:

> Because of the continued expansion of its production capacity, during the third quarter of 2000 the Company was able to eliminate the allocation of product supply to its network of wholesale distributors and retail dealers. As a result, customers generally no longer seek to stockpile inventories. The Company believes there has been a temporary slowdown in new orders as excess inventories at the wholesale and retail levels are reduced, and that the impact of this slowdown may continue until the normal seasonal demand for Trex resumes in the first quarter 2001.

Plaintiffs contend that this statement fraudulently failed to disclose Trex's excess manufacturing capacity which had resulted from increased competition and stockpiled distributor inventories. Plaintiffs also maintain that the statement falsely suggests that Trex's distribution channels were shedding excess inventories, when, in fact, the company's channel stuffing was causing even greater distributor stockpiling. As a result of these statements, Trex's common stock price recovered to around $28 at the beginning of January 2001.

In a press release on February 26, 2001, defendant Matheny discussed Trex's fourth quarter and year 2000 results. Trex reported fourth quarter revenues of $16.3 million, an increase of 28% from the fourth quarter 1999, despite Trex's previously revised prediction in November of little or no fourth quarter growth. Defendant Matheny stated:

> Fiscal 2000 has been another record year for our growing business. We achieved solid revenue and earnings gains, made substantial progress in our long-range expansion plans, and increased our distribution network. This steady progress enabled us to easily surpass the $100 million dollar revenue milestone. Since 1998, the year before Trex's IPO, revenues have increased by 139% while income grew by 177% on a supplemental pro forma basis . . .

> \*  \*  \*  \*  \*  \*

> Going forward we continue to see great opportunities for long-term growth for Trex Company in the decking market. Non-wood decking still represents only 5% of the approximately $2.5 billion spent on decks in 2000 in the U.S. We have established ourselves as the leader in the non-wood decking market and intend to build upon this momentum. Our recent announcement of a third

> manufacturing site demonstrates the commitment to our strategy of steady, controlled expansion. It is clear that underlying demand is growing as the knowledge of our superior products spreads among contractors and homeowners. We believe this demand will continue to drive the long term demand of Trex Company.

Plaintiffs argue that this statement was materially misleading because it omitted the existence and impact of Trex's channel stuffing activities and failed to disclose defendants' knowledge, based on inventory and sales reports faxed by Trex's wholesalers and dealers, that the growth rate in revenues in the first quarter was significantly down from prior quarters, "and would be in the range of only 10% for the quarter."

Trex's "management" participated in a conference call on February 27, 2001, to discuss Trex's fourth quarter and year 2000 financial performance. During the call "management" predicted 2001 revenues of $147 – $158 million and 20% sales growth in the first quarter of 2001, as compared to the first quarter of 2000. Plaintiffs argue that these predictions were unreasonable because Trex's first quarter sales growth could not exceed 10% based on the individual defendants' knowledge of orders, wholesaler and dealer inventories, 2001 sales at 2000 prices, increased competition, and pricing pressures. The statements also concealed that first quarter revenue growth was attributable to channel stuffing and that later quarters would inevitably suffer as a result. Based on these statements, Trex's stock rose from $22.89 on the day before the February 26, 2001 press release to over $28 after March 9, 2001.

On March 28, 2001, the Company filed its Year 2000 Form 10–K, signed by the individual defendants. Plaintiffs challenge a number of the statements in this filing.

First, describing Trex's sales and marketing, the individual defendants stated that the Company "seek[s] to achieve sales growth in the decking market by converting demand for wood decking products into demand for Trex," and that "sales growth in the decking market will largely depend on converting demand for wood products into demand for Trex." Plaintiffs maintain that these statements materially mislead investors by hiding the fact that Trex's sales growth in the fourth quarter 2000 and the first quarter 2001 resulted from channel stuffing, and that channel stuffing was "a key element of their sales and marketing."

Describing Trex's distribution methods, the individual defendants declared that "[t]he distributor generally purchases Trex at our prices in effect at the time we shipped the product." Plaintiffs contend that this statement was false because defendants knew that from the fourth quarter 2000 into the first quarter 2001, Trex "was selling product to its wholesale distributors" at 2000 prices and shipped the product under those orders after prices had increased.

In discussing Trex's net sales growth, the individual defendants stated that "[t]he increase in net sales is primarily attributable to the growth in sales volume. The Company's branding and product differentiation strategy enables the Company both to command premium prices and to maintain price stability for Trex." Plaintiffs maintain that this statement failed to disclose that net sales increased because of channel stuffing, rather than true demand, and was false because Trex did not maintain "price stability" because it did not adhere to its price increases, but sold product at reduced historical prices in order to generate sales.

Comparing year 2000 with year 1999 results, the individual defendants concluded that "[t]he increase in net sales was primarily attributable to a growth in sales volume and, to a lesser extent, a price increase of approximately 7.3%." Plaintiffs argue that this statement was false and misleading because in the fourth quarter 2000 Trex artificially inflated net sales by channel stuffing, and did not adhere to the 7.3% price increase.

Finally, the individual defendants noted an "increase in receivables, as the Company offered some distributors extended payment terms in the fourth quarter of 2000 to facilitate the addition of new distributors and the introduction on a national basis of the newest Trex color, Madeira." This statement falsely led the investment community to believe that Trex had a small "extended payment policy," when in fact defendants were stuffing the channels beginning in the third quarter, which involved "nationwide" extended payment terms for many Trex products that began in the third quarter 2000 and continued into the first quarter 2001. After Trex filed its Year 2000 Form 10–K, the Company's common stock price rose to $31.01 on March 30, 2001, a class period high.

On April 23, 2001, Trex issued a press release in which defendant Matheny discussed the Company's first quarter 2001 financial results. Defendant Matheny noted an 8% increase in revenues from first quarter 2000 and further declared:

I am pleased with the continued progress that is being made at Trex Company on a number of important fronts. Despite a weather related late start of the decking season, we have posted another quarter of growth in every major measurement, including revenue, product shipped, operating earnings, and net income. As we enter the busy spring season, we are well prepared to supply our growing network of distributors and contractors.... Going forward, we will continue to implement our proven growth strategies.... Third, we will en-

sure that our manufacturing capacity stays ahead of growing demand.

The following day Trex held its quarterly conference call to discuss its performance with financial analysts. During that call, defendant Matheny revised downward estimated sales revenues to $81 million for the first half of 2001. Defendant Matheny stated that Trex's lower than expected first quarter earnings resulted from three challenges Trex faced: a slumping economy, adverse weather, and the transition from allocation to a normal ordering system. Plaintiffs contend that these statements mislead the market into believing that the lower growth rate was due to the weather, general economic conditions and the transition from allocation, rather than Trex's undisclosed channel stuffing. Plaintiff also maintain that the statement failed to disclose that revenues would decline dramatically in the first half of 2001 due to high dealer inventories. In light of defendants' knowledge of wholesaler inventories and slumping revenues, defendants allegedly had no reasonable basis on April 24, 2001, for believing that they could achieve $81 million in revenue in the first half of 2001. As a result of these statements, Trex's stock price rose from $24.85 on Friday, April 20, 2001, to $28.35 on April 25, 2001.

Trex filed its first quarter 2001 Form 10–Q on May 15, 2001. That filing, signed by defendant Cavanna, provided:

> Because of the continued expansion of its production capacity, during the third quarter of 2000 the Company was able to eliminate the allocation of product supply to its network of wholesale distributors and retail dealers. As a result, customers generally no longer seek to stockpile inventories. The Company believes there has been a temporary slowdown in new orders as excess inventories at the wholesale and retail levels are

reduced, and that the impact of this slowdown may continue until the normal seasonal demand for Trex resumes in the second quarter of 2001.

Plaintiffs argue that this statement was materially misleading because dealers still sought to stockpile inventories due to channel stuffing. Plaintiffs further contend that the statement fraudulently failed to disclose that channel stuffing activities had created wholesaler and dealer inventories that were so large that they would inevitably cause a slowdown of new orders in the second quarter. After this statement, Trex's stock continued to trade around $28.

Finally, defendants allegedly began to disclose the truth when, on June 18, 2001, they issued a press release disclosing that Trex expected that revenues for the second quarter would reach only $24 to 26 million, "resulting in total revenue of only $66 to 68 million for the first half [of] 2001, not the $81 million previously stated...." In the quarterly conference call with analysts on June 24, 2001, defendant "Matheny admitted that Trex's reduced second quarter revenues were 'the direct result of large inventory positions taken by our distributors and dealers during last year [2000] and early this year.'" After the disclosure, Trex's common stock fell $7.98 per share, closing at $18.50 on June 19, 2001.

## II. Applicable Pleading Standards

Because plaintiffs' claims sound in fraud, the complaint must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. The PSLRA codifies the pleading requirements of Rule 9(b) [3] and imposes even more stringent standards. First, the PSLRA requires that the complaint "specify each statement

---

**3.** Rule 9(b) requires the plaintiffs to state

"with particularity" "the circumstances con-

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b). Second, and most notably, the PSLRA requires that a complaint must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "A complaint that fails to comply with these requirements must—on any defendant's motion—be dismissed." *In re MicroStrategy, Inc. Secs. Litig.*, 115 F.Supp.2d 620, 628 (E.D.Va.2000) (citing 15 U.S.C. § 78u–4(b)(3)(A)).[4]

### III. Count I—Section 10(b) and Rule 10b(5)

■ To state a claim for securities fraud under section 10(b) of the Exchange Act and under Rule 10b–5, plaintiffs must allege that defendants "(1) made a false statement or omission of material fact, (2) with scienter, (3) upon which the plaintiff justifiably relied, (5) that proximately caused the plaintiff's damages."[5] *Phillips,*

---

stituting fraud or mistake." Fed.R.Civ.Pro. 9(b); *In re Criimi Mae, Inc. Securities Litig.*, 94 F.Supp.2d 652, 656 (D.Md.2000) ("Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statement, as well as the specific manner in which the statements are false and the specific facts raising an inference of fraud.")

Many of plaintiffs' allegations of primary liability against defendants depend on the "group pleading" doctrine, which relaxes Rule 9(b)'s pleading requirements in cases of corporate fraud. Under the group pleading doctrine, corporate officers and director's alleged to be in daily control of the company may be presumed collectively responsible for the company's "group published" information such as annual reports, press releases and other public filings. *See, e.g., In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995). Thus, when Plaintiffs allege that group publications contained misleading information, they need not specify which corporate officers conveyed the alleged misrepresentation. *Id.*

The parties disagree as to whether the group pleading doctrine applies in the Fourth Circuit. Since Plaintiffs have failed to state a claim against any defendant on which relief can be granted, the court finds it unnecessary to resolve the issue.

4. Of course, since the matter before the court is a motion to dismiss for failure to state a claim on which relief may be granted, the court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole and assume the facts asserted are true. Fed.R.Civ.P. 12(b)(6); *MicroStrategy Inc.*, 115 F.Supp.2d at 627 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Nevertheless, while the court "is bound to accept as true factual allegations in support of the complaint, the court 'is not so bound by the plaintiff's legal conclusions, since the purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint.'" *Falwell v. Executive Office of the President*, 158 F.Supp.2d 734, 741 (W.D.Va.2001) (*quoting Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994)).

5. Section 10(b) states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

15 U.S.C. § 78j(b). Rule 10–b–5, in turn, specifies that the statute proscribes "mak[ing] any untrue statement of material fact or . . .

**606**

190 F.3d at 613. In support of their motion to dismiss, defendants argue that plaintiffs have failed to plead particular facts raising a strong inference of scienter or indicating that any challenged disclosure was materially false or omissive.[6] The court will consider these arguments in turn.

### A. Scienter

As noted above, the PSLRA requires plaintiffs to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). According to the Fourth Circuit, plaintiffs must plead sufficient facts that the defendants acted with "scienter," *i.e.*, that they "acted intentionally, which may perhaps be shown by recklessness." *Phillips*, 190 F.3d at 620. The PSLRA does not change the standard of proof for scienter that a plaintiff must satisfy at trial. It did, however, heighten the standard for pleading scienter by requiring that the plaintiff allege particular facts that raise a "strong inference" of the requisite state of mind. *Id.*

The exact standard for pleading a strong inference of scienter remains unclear. The Fourth Circuit has not yet had occasion to specify "which pleading standard best effectuates Congress's intent." *Id.* at 621. In *Phillips*, the only case that has presented the issue to the Court of Appeals, the court declined to interpret the PSLRA's requirements because the plaintiffs "failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA"—that articulated by Second Circuit before the PSLRA's enactment. *Id.* at 621. Under the Second Circuit standard, plaintiffs may establish a "strong inference" of scienter by alleging specific facts that either (a) show that defendants had both motive and opportunity to commit fraud or (b) constitute strong circumstantial evidence of conscious or reckless misbehavior. *Id.* at 620 (*citing In re Time Warner, Inc. Securities Litig.*, 9 F.3d 259, 268–69 (2d Cir.1993)). Like the Fourth Circuit in *Phillips*, the court finds it unnecessary to determine the specific contours of the PSLRA's heightened requirements for pleading scienter[7] and

omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

**6.** Defendants also assert that most of the statements in question are protected by the PSLRA's "safe harbor" and the "bespeaks caution" doctrine. The PSLRA provides a safe harbor from liability for certain "forward-looking statements." 15 U.S.C. § 78u–5(c)(1). In that safe harbor, corporations and individual defendants are not liable for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u–5(c)(1)(A)(i). If the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with "actual knowledge" that the state-

ment was "false or misleading." *Id.* § 78u–5(c)(1)(B). Under the "bespeaks caution" doctrine, defendants are not liable for statements that "bespeak caution" when considered in their entirety, such as when they are accompanied by cautionary language and disclosures of risk factors. *See Gasner v. Board of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996). Since the complaint fails to satisfy the PSLRA's strict pleading standards, the court need not determine the applicability of the additional protection provided to defendants' allegedly fraudulent statements by the PSLRA's safe harbor or the "bespeaks caution" doctrine.

**7.** Following the passage of the PSLRA, various circuits have interpreted the statute's "strong inference" standard differently. The Fourth Circuit and other district courts in this circuit have succinctly discussed the conclusions which the other circuits have reached on the issue. *See Phillips*, 190 F.3d at 620–21; *MicroStrategy*, 115 F.Supp.2d at 628–29;

applies the more lenient Second Circuit standard. Plaintiffs, nevertheless, fail to establish scienter.

### 1. Motive and Opportunity

■ "In order to demonstrate motive, a plaintiff must show 'concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.'" *Phillips*, 190 F.3d at 621 (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). Opportunity entails the means and likely prospect of achieving concrete benefits by the means alleged. *In re E.Spire Communications, Inc. Securities Litig.*, 127 F.Supp.2d 734, 742 (D.Md.2001) (*citing Shields*, 25 F.3d at 1130.). The individual defendants undoubtedly had the opportunity to issue fraudulent financial statements because of their positions of power and authority within the company. Plaintiffs however, have not plead sufficient facts concerning the individual defendants' motive to commit fraud.

■ Plaintiffs contend that the individual defendants were motivated to issue the allegedly misleading statements in question by analysts' concerns expressed at the beginning of the class period that Trex could not meet fourth quarter 2000 revenue expectations (Plaintiff's Letter Brief, May 9, 2002) and by the individual defendants' desire to increase their annual bonus in 2000. The individual defendants bonuses in 2000 were tied directly to the amount that the Company's net income in 2000 exceeded net income in 1999.[8] Thus, by capturing 2001 sales and redirecting them into the fourth quarter of 2000, plaintiffs argue, the individual defendants significantly increased their year end bonuses.

Plaintiffs' allegations are insufficient to create a strong inference of scienter because they concern motivations common to all corporate officers. *Phillips*, 190 F.3d at 623; *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1268–70 (10th Cir. 2001) (finding that business motives shared by all companies and personal motives shared by all executives cannot by themselves sustain a claim for securities fraud). Every corporate officer wants to meet analysts' expectations, and every corporate officer wants a bigger bonus. Allegations based solely on these incentives lead to no more than a "strained and tenuous inference of motive," and therefore must fail.

---

*Criimi Mae, Inc.*, 94 F.Supp.2d 652. The court finds no useful purpose in repeating those summaries here, but notes that it finds persuasive the reasoning in *MicroStrategy*, which lead the court to reject the mechanical application of any judicial test, and instead assess "the totality of the circumstances as alleged in the complaint [to] determine if those alleged circumstances support a strong—*i.e.*, cogent and persuasive—inference that a defendant acted intentionally, consciously, or recklessly." *MicroStrategy*, 115 F.Supp.2d at 633–34.

8. The Company's April 6, 2001 proxy statement provides:

Annual Cash Bonuses. Trex Company pays annual cash bonuses to its executive officers based upon the achievement of a net income objective. This objective is established at a level which is intended to assure that, if achieved, the level will represent a significant improvement in stockholder value. Executive officers have the opportunity to earn cash bonuses equal to a varying percentage of their base salary, depending upon the attainment of this objective.

Although Trex Company did not achieve its net income objective for fiscal 2000, net income for fiscal 2000 exceeded net income for fiscal 1999 by approximately 50%. Applying the bonus formula specified for fiscal 2000, the committee approved an annual bonus for the chief executive officer equal to 83% of his target annual bonus and annual bonuses for the other executive officers also equal to 83% of their respective target annual bonuses. All target annual bonuses for a fiscal year are measured as a percentage of the executive's base salary for that fiscal year.

*Phillips,* 190 F.3d at 621; *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002); *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) ("[P]laintiff's allegation of motive—basically that the defendant and officers were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants.").[9]

### 2. Conscious or Reckless Misconduct

■ Even though plaintiffs have failed to show motive and opportunity, they may still satisfy their burden of pleading scienter under the Second Circuit test by alleging particular facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Phillips,* 190 F.3d at 620; *Time Warner, Inc.,* 9 F.3d at 268–69. The Fourth Circuit has defined the degree of recklessness that Plaintiffs must allege as "an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it.'" *Phillips,* 190 F.3d at 621 (*quoting Hoffman v. Estabrook & Co., Inc.,* 587 F.2d

509, 517 (1st Cir.1978)). "Reckless in this context is viewed as a lesser form of intent, rather than merely a greater degree of ordinary negligence, and mere negligence is not sufficient to support liability." *Criimi Mae Inc.,* 94 F.Supp.2d at 660–61 (citations omitted). The court concludes that the complaint fails to satisfy the standard for conscious or reckless misconduct because it relies solely on allegations of channel stuffing and because it does not plead "with particularity" facts creating a "strong inference" that defendants consciously or recklessly failed to disclose their channel stuffing activities. 15 U.S.C. § 78u–4(b).

■ The essence of the complaint is that defendants engaged in channel stuffing and failed to disclose it. Allegations of channel stuffing, standing alone, are insufficient to sustain the state of mind requirement in a securities fraud claim because "there may be a number of legitimate reasons for attempting to achieve sales earlier" than in the normal course.[10] *Greebel,* 194 F.3d at 185 (concluding that channel stuffing allegations "[do] not support a strong inference of scienter"). *See also In re Splash Tech. Holdings Securities Litig.,*

---

(Rizzo Aff., Ex. M [SEC Form DEF 14–A (Proxy Statement), filed April 6, 2001] at 13.)

9. Even if allegations based on incentive compensation were sufficient to establish motive, here the individual defendants incentives to commit fraud were relatively small. The individual defendants point out that their 2000 annual bonuses ranged from $132,600 to $166,600, while the market value of their stock holdings at that time (assuming the closing price of $30.01 on January 31, 2001) ranged from $55,538,996.83 to $62,041,863.73. Together, the individual defendants own over 55% of Trex's common stock. Given the individual defendant's enormous long term investment in the company, they had a tremendous incentive not to jeopardize the value of Trex stock. It is apparent to the court that such an incentive would dwarf any motivation to obtain a bonus of less than $170,000.

10. Indeed, as defendants point out, it is unclear from the complaint that defendants' channel stuffing even substantially increased fourth quarter 2000 revenues. Much of Trex's alleged channel stuffing involved charging 2000 prices for orders placed in 2000 for delivery in 2001. (compl.¶ 22(a).) According to Trex's 1999 Annual report on Form 10–K and its 2000 Annual Report on Form 10–K, "[t]he Company recognizes revenue at the point of sale, which is at the time of *shipment* to the customer from the Company's manufacturing facilities." (Def.'s Mot. to Diss., Rizzo Aff., Ex. I at 38) (emphasis added). Absent allegations of accounting violations, the court must assume that many of the discounted customer orders received in the fourth quarter 2000 did not effect the revenues reported for that quarter because Trex does not recognize revenue until it ships the product.

160 F.Supp.2d. 1059, 1075–76 (N.D.Cal. 2001); *Pirraglia v. Novell Inc.*, No. 2:99CV–995C, 2000 WL 33194748, at *2–3 (D.Utah Nov.2, 2000) (finding that "channel stuffing" does not support a "strong inference" of scienter); *Fitzer v. Security Dynamics Tech., Inc.*, 119 F.Supp.2d 12, 36 (D.Mass.2000) (same); *In re Dura Pharm., Inc. Securities Litig.*, No. 99–CV–0151, 2000 WL 33176043, at *8 (S.D.Cal. July 11, 2000) (finding no strong inference of scienter from alleged "channel stuffing").[11]

In *Greebel*, the First Circuit considered whether evidence of channel stuffing could give rise to a strong inference of scienter. 194 F.3d at 185. The plaintiffs alleged that management knew that FTP Software's revenues during the class period would be low "and attempted to hide that fact by shifting income through channel stuffing (which remained undisclosed) and by artificially inflating income through improper revenue recognition [(defendants allegedly booked sales as revenue even though customers were entitled to return any unsold product)]." *Id.* at 202–03. The

First Circuit ruled that channel stuffing evidence may have some probative value under such circumstances, "but that value is weak." *Id.* at 203. Here, plaintiffs similarly allege that defendants attempted to postpone low revenues through channel stuffing, but they do not allege that defendants committed accounting violations. Thus, the value of their channel stuffing allegations is even weaker than in *Greebel.* Consequently, the complaint cannot and does not satisfy the standard for pleading conscious or reckless misconduct.

Even if channel stuffing allegations were sufficient, however, the complaint fails to plead with particularity facts giving rise to a strong inference that defendants consciously or recklessly failed to disclose their channel stuffing activities. Plaintiffs support their reckless or conscious failure to disclose claim with two general allegations: (1) defendants knew that channel stuffing was primarily responsible for Trex's financial performance during the class period, and (2) defendants knew that wholesaler inventories were to large for the Company to engage in channel stuff-

**11.** In a letter brief submitted after oral argument, plaintiffs direct the court's attention to *Securities and Exchange Commission v. Dunlap,* [current] Fed.Sec.L.Rep. (CCH) ¶ 91, 771 at 98, 677, 2002 WL 1007626 (S.D.N.Y. March 27, 2002), where the court recognized that "allegations of omissions and misrepresentations regarding channel stuffing … are actionable." (*quoting Harvey M. Jasper Retirement Trust v. Ivax Corp.,* 920 F.Supp. 1260, 1266–67 (S.D.Fla.1995)). As a preliminary matter, the court notes that *Dunlap* is an SEC enforcement proceeding, not a private securities action. Thus, it is not subject to the heightened pleading standards of the PSLRA, upon which defendants base their motion. *See SEC v. ICN Pharmaceuticals, Inc.,* 84 F.Supp.2d 1097, 1099 (C.D.Cal.2000).

Before Congress passed the PSLRA, some courts, including the case quoted in *Dunlap,* found allegations of channel stuffing sufficient to avoid stays of discovery or survive motions for dismissal or summary judgment. *See e.g.,*

*Ivax Corp.,* 920 F.Supp. 1260, 1266–67 (S.D.Fla.1995); *In re Lotus Dev. Corp. Sec. Litig.,* 875 F.Supp. 48, 53 (D.Mass.1995); *In re Compaq Sec. Litig.,* 848 F.Supp. 1307, 1319–20 & n. 37 (S.D.Tex.1993). However, the court is aware of no case decided after the passage of the PSLRA in which allegations of channel stuffing, standing alone as in this case, were found sufficient to sustain a claim for securities fraud. Indeed, each decision plaintiffs cite to support the adequacy of their channel stuffing allegations involved more culpable behavior such as, for example, alleged violations of Generally Accepted Accounting Principles. *See Dunlap,* [current] Fed.Sec.L.Rep. (CCH) ¶ 91,771 at 98,678, 98,-681, 2002 WL 1007626; *In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 580–82 (D.N.J.2001); *Novak v. Kasaks,* 216 F.3d 300, 304 (2d Cir.2000); *Florida Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 649–50 (8th Cir.2001).

ing. The court finds no particular facts in the complaint that create a strong inference of either of these allegations.

First, plaintiffs allege in conclusory fashion that the individual defendants knew that Trex's alleged channel stuffing activities caused both the increase in fourth quarter 2000 revenues, and the failure of second quarter 2001 revenues to meet the Company's projections. To support this allegation, plaintiffs rely on defendants' access to internal reports. (Compl. ¶ 44(a)–(f)) "[A] proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir.1999). Those specifics may include "facts concerning the people who made or received the reports, the content of the reports, the dates of transmissions, the manner in which they were transmitted or the bases for plaintiff's knowledge." *Splash Tech. Holdings, Inc.*, 160 F.Supp.2d at 1070. Here, plaintiffs fail to plead any specific facts relating to any internal report, including who prepared it, which officers reviewed it or where plaintiffs obtained their information. Nor do plaintiffs include an adequate description of any report's contents. Thus, the complaint fails to plead any particular facts indicating that defendants' should have known the actual economic impact the alleged channel stuffing had on the company's financial performance.[12]

Similarly, the complaint does not contain particular facts supporting its allegations that the defendants knew the size of their wholesaler's and retailer's inventories.

Plaintiffs allege that monitoring wholesale and retail inventories was not difficult for the individual defendants because Trex sells only one product, and its five principle customers account for 75% of its sales. While this allegation provides an inference that the individual defendants should have had some knowledge of customer inventories, the court notes that Trex's 2000 10–K[13] disclosed that Trex sold its product "to 25 wholesale companies operating from approximately 75 distribution locations." which "marketed Trex to approximately 2,600 dealer outlets across the United States." (Def.'s Mot. to Dism., Rizzo Aff., Ex. I at 7.) Plaintiffs also allege that the individual defendants required monthly reports of retail sales and inventories, shipped product directly to retail dealers and sent employees to retail dealers to take inventory. (Compl. ¶ 44(c)) To support these allegations plaintiffs attach two blank forms to the complaint, which they allege Trex created to monitor wholesaler inventories (Compl., Ex. A) and retail sales (Compl., Ex. B). Again, however, plaintiffs do not mention the sources of their information with respect to these forms, how they learned of them, who used them, which officers received them, or, most importantly, the specific information these reports contained. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir.2002) (finding that the failure to allege with particularity the content of data which allegedly formed the basis of defendants' knowledge is insufficient to satisfy the heightened pleading requirements of the PSLRA); *Splash Technology Holdings, Inc.*, 160 F.Supp.2d at 1070.

In summary, since the complaint fails to set forth specific allegations regarding ei-

---

12. Such particular facts might include, but are not necessarily limited to, facts indicating the percentage of sales transactions Trex actually discounted in each quarter or the net effect that those discounted sales had on the particular quarter's net revenues.

13. The court's consideration of the Company's Year 2000 Form 10–K is appropriate at this stage of the litigation and does not convert the motion to dismiss into one for summary judgment. *Phillips v. LCI International, Inc.*, 190 F.3d 609, 618 (4th Cir.1999)

ther defendants' awareness of the impact Trex's alleged channel stuffing had on the company's financial performance or defendants' knowledge of wholesaler and dealer inventories during the class period, the court cannot ascertain whether there is any basis for the general allegation that the individual defendants should have known that their failure to disclose the details of their alleged channel stuffing was a materially misleading omission. Plaintiffs' complaint simply is not particular enough to raise a strong inference of conscious or reckless misconduct.

## B. Material Misstatement or Omission

Challenging the complaint under the materiality prong of a securities fraud claim, defendants contend that plaintiffs have failed to plead particular facts to support their allegations that statements made during the class period were materially misleading.[14] The court agrees.

■ Courts require significant specificity when a plaintiff bases a claim on allegations of channel stuffing or other misleading revenue recognition. *See Silicon Graphics Inc.*, 183 F.3d at 984 (finding that PSLRA requires a plaintiff pleading securities fraud "to provide a list of all relevant circumstances in great detail"); *Fitzer*, 119 F.Supp.2d at 35–36. " 'To adequately plead financial fraud based on improper revenue recognition, plaintiffs must allege, at minimum, some particular transactions where revenues were improp-

erly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions.'" *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 277 (D.Mass.1998) (quoting *In re Oak Tech. Securities Litig.*, No. 96–20552 SW, 1997 WL 448168, at *8 (N.D.Cal. July 1, 1997)).

■ Here, plaintiffs offer only conclusory allegations that defendants' sales practices at the beginning of the class period materially inflated revenues in the fourth quarter 2000 and depressed them in the first half of 2001. They have not identified even one particular transaction involved in defendants alleged channel stuffing activities, nor provided the court with the amount or percentage of revenues those transactions generated. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st. Cir.1996) (dismissing allegations of revenue overstatement where plaintiff had not alleged the amount of the overstatement or the net effect it had on the company's earnings); *In re Miller Indus., Inc. Securities Litig.*, 12 F.Supp.2d 1323, 1328 (N.D.Ga.1998) (finding sufficient particularity when plaintiffs identified particular transactions). *But see Aldridge*, 284 F.3d at 78 (concluding that district court erred in dismissing complaint due to an absence of specific figures regarding which transactions were misstated and by what amounts).[15] Without a more specific basis

---

**14.** Defendants do not make the substantive contention that the allegedly misleading statements were immaterial, *i.e.*, that "a reasonable investor, exercising due care, would [not] gather a false impression from [the] statement[s], which would influence an investment decision...." *Phillips*, 190 F.3d at 613 (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968) (en banc)).

**15.** In *Aldridge*, the First Circuit reversed the district court's dismissal of a securities fraud complaint that alleged that A.T. Cross Corpo-

ration ("Cross") failed to disclose its sales strategies, which included price protection, take backs, and channel stuffing, or estimate a loss and set a reserve with respect to contingent sales as required by generally accepted accounting principles. 284 F.3d at 77, 79. In analyzing the sufficiency of plaintiff's fraud allegations, the First Circuit found that the district court had placed too much emphasis on the statement in Greebel "that the absence of specific identifying information as to the amount and nature of contingent sales transactions was indicative of the generality of the

for determining the effect of defendants' alleged channel stuffing, the court cannot determine whether the failure to disclose those activities more specifically was a material omission.[16] In short, plaintiffs have not plead their allegations in a context that permits the court to conclude that the allegations if proven are indeed material.

## IV. Count II—Section 20(a)

Section 20(a) of the Exchange Act provides for derivative liability of persons who "control" those who are primarily liable under the Act.[17] 15 U.S.C. § 78t(a). A plaintiff claiming liability under section 20(a) must first allege a primary violation of the Exchange Act by the controlled person, and direct or indirect control by the defendant charged as the controlling person. *MicroStrategy*, 115 F.Supp.2d at 659. Since Plaintiffs' have failed to state a claim for a primary securities fraud violation, the court will dismiss their claim for violation of section 20(a) of the Exchange Act.

violations of GAAP standards ... and thus insufficient by itself to infer scienter." *Id.* at 80 (*citing Greebel*, 194 F.3d at 203–04). The court distinguished the case before it from the facts in *Greebel*, based on the evidence of statements by Cross management which indicated material undisclosed contingent sales, and the reasonable inference that all Cross's customers received price protection. In light of this additional evidence not present in *Greebel*, "[t]here was ... little need for the type of specificity" on which *Greebel* relied. 284 F.3d at 80.

Like the First Circuit in *Greebel*, the court today does not hold that a plaintiff must always allege the specific amount of displaced revenues in order to state a claim that undisclosed channel stuffing activities were fraudulent. *See* 194 F.3d at 204 (noting the "complete absense" of particulars but refusing to hold that every complaint must include such specifics). Rather, the court considers all the circumstances, including the lack of allegations of improperly recorded contingent sales (as were present in *Aldrige*), and finds that a complaint resting on allegations of channel stuffing alone must fail, especially when the complaint fails to set forth the actual extent that those sales practices affected net revenues.

16. Even though defendants do not make the substantive contention that their alleged failure to disclose the Company's channel stuffing activities was immaterial, *i.e.*, that it did not significantly alter the total mix of information available to investors, *see Basic v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (cautioning that courts should examine the materiality of allegedly fraudulent statements in light of the

"total mix" of information available to investors), the court notes that defendants, in fact, did disclose that they discounted sales during the class period. Beginning in November, 2000, with its third quarter 2000 Form 10–Q, Trex disclosed that "[n]et sales consists of sales net of returns and discounts," (Rizzo Aff., Ex. F at 10), and made the same disclosure in March, 2001, in its Year 2000 Form 10–K, (Rizzo Aff., Ex. I at 21), and in May, 2001, in its first quarter 2001 Form 10–Q, (Rizzo Aff., Ex. L at 8). In its Year 2000 Form 10–K Trex made the additional disclosure that "[t]he effect of a higher sales volume in 2000 was more than offset by increases in receivables, as the company offered some distributors extended payment terms in the fourth quarter of 2000." (Rizzo Aff., Ex. I at 22.) Trex also disclosed in its first quarter 2001 Form 10–Q that accounts receivable had risen, in part, as a result of "the Company's augmented early-buy program, which offered extended payment terms for purchases by distributors during the months of January through April." (Rizzo Aff., Ex. L at 10.)

17. Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

## V. Conclusion

For the foregoing reasons, the court will grant defendants' motion to dismiss the complaint. The court will enter an appropriate order this day.

### *FINAL ORDER*

In accordance with the memorandum opinion entered this day, it is **ORDERED and ADJUDGED** that defendants' motion to dismiss the Consolidated Amended Complaint is **GRANTED**. This action is stricken from the active docket of this court.